In the Matter of the MIDDLEFORK WATERSHED CONSERVANCY DISTRICT.

Gilbert KLEAVING, Margi Kleaving, Marvin J. Ubelhor, Alva Kleaving, Wayne S. Kessens, Lucy Ubelhor, Charles E. Hattenbach, Sheila F. Hattenbach, Hubert Kleaving, Alice Kleaving, Wayne Kleaving, Hilarion Gaffinet, Cyril Kleaving, Harold Deom, Omir Deom, Alfred Deom, Robert Haring, Jr., Elmer Deom, Cletus Deom, Zella Deom, Mary Anna Gaffinet, Gordon Taylor, Allen Esarey, Gary A. Esarey, Alberta Esarey, Murl Taylor, Theresia Taylor, Alvena Mosby, and Frieda Kleaving, Plaintiffs-Appellants,

v.

BOARD OF DIRECTORS OF MIDDLEFORK WATERSHED CONSERVANCY DISTRICT, Defendant-Appellee.

No. 62A01–8609–CV–00251.

Court of Appeals of Indiana, First District.

June 3, 1987.

Rehearing Denied July 16, 1987.

James M. Houck, Greencastle, John D. Clouse, Evansville, for plaintiffs-appellants.

Bruce E. Cissna, Dale, for defendant-appellee.

RATLIFF, Chief Judge.

## STATEMENT OF THE CASE

Petitioners appeal from the trial court's denial of their Petition for Mandate brought pursuant to Indiana Code section 13–3–3–48 to require the Board of Directors of Middlefork Watershed Conservancy District to maintain existing structures and to complete implementation of the District Plan. We reverse.

## FACTS

The Middlefork Watershed Conservancy District (District) was created on October 13, 1959, by order of the Perry Circuit Court pursuant to the Indiana Conservancy Act (Indiana Code section 13–3–3–1 *et seq.*). The purposes of the District are flood prevention and control and improved drainage of the area. The area concerned consists of 60,800 acres, representing a substantial portion of the middle fork of the Anderson River in Perry County, Indiana, with a small portion lying in Crawford County. To accomplish the designated purposes, the Board of Directors of the District (Board) adopted a District Plan, consisting of a "Final Plan" and "Work Plan", which was approved by the trial court in March of 1963 pursuant to Ind. Code § 13–3–3–54. Plan preparation costs were provided by the U.S. Department of Agriculture, acting through the Soil Conservation Service. The Plan included an agreement between the District and Soil Conservation Service wherein the District would provide the land rights, be responsible for administering construction contracts, and maintain the completed structures, while the Soil Conservation Service agreed to bear the construction costs of the improvements contemplated.

The Plan provided a means to retard the rate of surface run-off upstream by construction of seven (7) flood-water retaining structures designated as Structures 1, 2, 3, 4, 5, 6, and 7, and to increase down-stream channel capacities to carry off flood waters and to improve drainage by means of 34.4 miles of channel improvement. Supplements 1, 2, and 3 to the Watershed Work Plan are agreements between local sponsoring organizations, the District, and the Soil Conservation Service to add recreational facilities to structures 1, 4, 5, and 6, all located on U.S. Forest Land Service land, and to reapportion some of the costs between the Forest Service and Soil Conservation Service. Structures 2 and 7 remained single-purpose structures and were to be located on private property. On January 8, 1965, the Board amended the Plan. The changed construction schedule provided for six (6) dams prior to commencement of the channel improvement work, and included the determination that ninety per cent (90%) of local costs be borne by adjacent landowners through exceptional benefit assessments. This amendment to the Plan was approved by the trial court, pursuant to I.C. § 13–3–3–57, on March 20, 1965.

In accordance with the amendment, and pursuant to I.C. § 13–3–3–61, the court appointed a Board of Appraisers. The appraisers report determined the amount of exceptional benefits that would accrue to certain real property in the District due to execution of the District Plan. This report

was approved and adopted by the court on January 29, 1975, and the Perry County treasurer was appointed to collect the exceptional benefits assessments. These assessments were collected over a ten (10) year period and have now been paid by those assessed.

The flood-water retarding structures were installed and 10.5 miles of channel improvement were completed. Due to environmental concerns, the remaining work was restudied and modified and incorporated as Supplement number 4 to the Work Plan in January of 1981. The modification eliminated 8.4 miles of proposed channel work and substituted therefor two (2) single-purpose flood-prevention structures, numbered 11 and 23. The remaining 15.5 miles of proposed channel work remained essentially unchanged from the original Plan. However, the Board has taken no steps, since adoption of Supplement No. 4, to finish construction. In addition, the District Plan has not been amended to incorporate the changes of Supplement No. 4 to the Work Plan.

On April 9, 1982, the attorney for certain freeholders (Petitioners) made written demand on the Board to complete the improvements. A second request was made by the Soil Conservation Service at the Board's regular meeting on August 30, 1982. There was no evidence of maintenance of Structures 2 and 7, or the 10.5 miles of channel work. Consequently, a series of letters from the Soil Conservation Service, commencing May 11, 1981, called the Board's attention to the need for maintenance.

On December 20, 1982, the Petitioners filed a Petition for Mandate seeking to require the Board to properly operate and maintain the existing structures and to complete the remaining work. The Petitioners are owners of more than one half (½) of the bottom land within the District, and all were the subject of exceptional benefits assessments which they have paid. The Petitioners asserted they were not receiving the amount of flood-control or drainage benefits contemplated by the plan

and are now required to maintain the channel at their own expense.

There was varied testimony at trial. The Petitioners asserted that over seventy-five per cent (75%) of the land rights for channel improvement would be donated by persons affected. The District treasurer testified that the assessed valuation of the District is approximately $4,500,000.00 and that the thirteen cent (13¢) tax levy budgeted the previous year raised about $5,500. The treasurer added that the District was unable to do more than the available money permitted. The approximately $5,500 annually raised by the Board is used to make payments on outstanding obligations to the State, which have an outstanding balance of $5,000 plus interest. In addition, testimony revealed the existence of pending suits against the District over alleged damages resulting from construction of structures presently in place, resulting in substantial costs and legal expenses. The treasurer further testified that the Board had initiated maintenance by mowing structures 2 and 7. Finally, the Board opined that any further implementation of the District Plan would require that the Plan be resubmitted to the court to include Watershed Work Plan No. 4. The Petitioners concurred that the Plan should be resubmitted to the court to reflect the changes proposed by Work Plan No. 4 pursuant to I.C. §§ 13–3–3–53 and 13–3–3–57.

The trial court, in its judgment, found that the Act gives the Board great discretion in funding the contemplated work. In the court's opinion, original projections about the amount of funding necessary to complete the Plan were obviously erroneous. The court opined that any mandate it might order would necessarily force the Board to obtain large amounts of funds from one or more of its sources. Holding that decisions about whether to, how, and in what amount borrowing should be done by the District should be made by the Board, the court declined to mandate anything other than maintenance of existing structures and improvements as funds become available. The court noted that the Board members stand for review or election by a majority of the freeholders in the

District based on their action or inaction. The court further noted that Work Plan No. 4 was never submitted for its review but that the decision whether to submit it was for the Board. While safety factors were not an issue in the suit, the court noted that its ruling would be different if it were proven that lack of maintenance was causing serious safety problems. Thus, the trial court found that decisions on carrying out implementation of a complete plan and how to fund it are Board decisions. Thereafter, Petitioners perfected this appeal.

## ISSUE

The basic issue presented for review is whether the provisions of the Conservancy Act, Indiana Code sections 13–3–3–1 *et seq.*, relating to the development and implementation of a district plan and maintenance of existing structures, are mandatory or discretionary with the Board.

## DISCUSSION AND DECISION

 Determining legislative intent is foremost in construing any statute and, wherever possible, this court will give deference to that intent. *Board of School Trustees of the South Vermillion School Corp. v. Benetti* (1986), Ind.App., 492 N.E.2d 1098, 1102, *trans. denied; Smith v. State ex rel. Medical Licensing Bd.* (1984), Ind.App., 459 N.E.2d 401, 404; *Indiana State Highway Comm'n v. Bates and Rogers Const., Inc.* (1983), Ind.App., 448 N.E.2d 321, 324. Indispensible to ascertaining the legislature's intent is a consideration of the goals sought to be achieved and the reasons and policy underlying a statute. *Frost v. Review Bd. of Indiana Employment Sec. Div.* (1982), Ind.App., 432 N.E.2d 459, 461. Consequently, it is necessary to view a statute within the context of the entire act, rather than in isolation, when construing the statute. *Smith*, at 404; *Indiana Dept. of State Revenue v. Estate of Wallace* (1980), Ind. App., 408 N.E.2d 150, 154, *trans. denied.* Words in a statute are given their plain, ordinary, and usual meanings, absent legislative expression to the contrary. *Smith*,

at 404. In addition, this court may look beyond the statute's language to the titles and headings of the statute. *Id.* There is a strict presumption that a statute is constitutional which continues until it is clearly shown to be otherwise. *Benetti*, at 1102; *Wallman v. State* (1981), Ind.App., 419 N.E.2d 1346, 1348. Moreover, it cannot be presumed that a legislature expects its enactments to be applied in an illogical or absurd manner, inconsistent with its underlying policies and goals. *Benetti*, at 1102; *Highway Comm'n*, at 324; *Frost*, at 461.

 The Board maintains that the actions requested of it by the Petitioners are discretionary as provided in the statute. Conversely, the Petitioners assert that the statute confers a mandatory duty on the part of the Board to complete the project. A statute containing the term "shall" generally connotes a mandatory as opposed to a discretionary import. *State ex rel. City of Indianapolis v. Brennan* (1952), 231 Ind. 492, 498, 109 N.E.2d 409, 411; *State ex rel. DeArmond v. Superior Court of Madison County* (1940), 216 Ind. 641, 643, 25 N.E.2d 642, 642; *Hancock County R.E. M.C. v. City of Greenfield* (1986), Ind.App., 494 N.E.2d 1294, 1295, *trans. denied; Johnson v. Johnson* (1984), Ind.App., 460 N.E.2d 978, 979–80. However, "shall" may be construed as directory instead of mandatory "to prevent the defeat of the legislative intent." *Wysong v. Automobile Underwriters* (1933), 204 Ind. 493, 504, 184 N.E. 783, 787. *See Hancock County R.E. M.C.,* at 1295. Thus, the term "shall" is directory when the statute fails to specify adverse consequences, the provision does not go to the essence of the statutory purpose, and a mandatory construction would thwart the legislative purpose. *Hancock County R.E.M.C.,* at 1295–97.

 In construing the Conservancy Act, the statutes appear mandatory in nature. Even a quick perusal of the pertinent statutes suggests they are mandatory in nature. Indiana Code section 13–3–3–34, pertaining to directors of the Board, states:

"(i) Promptly after appointment or election the director shall take the following oath: 'I do solemnly swear that I

*shall,* to the best of my ability, *strive to accomplish the purposes for which the district is established and properly to operate and maintain* its works of improvement.'"

(Emphasis added). Indiana Code section 13–3–3–44, setting out the powers and duties of the Board of Directors states that "The board *shall:* ... (11) exercise the powers granted to accomplish the purpose or purposes for which the district is established, according to this chapter,"[1]

(Emphasis added). The section pertaining to preparation of the district plan, Indiana Code section 13–3–3–49, states: "(a) *Immediately* after the organizational meeting of the board, it *must* commence the preparation of the district plan to accomplish the purpose or purposes for which the district is established." (emphasis added). Finally, the section of the act dealing with the specific powers of the Board to implement the District Plan, Indiana Code section 13–3–3–58, states that "(a) The board *shall* place the district plan in operation by constructing *all* works and maintaining them in accordance with the district plan." (Emphasis added). There is no equivocation or ambiguity in this language nor any indication that the use of the word "shall" amounts to anything less than mandatory action in this case. On the contrary, here the word "shall" is employed in statutes directed at the ultimate purpose of the Conservancy Act and mandatory construction of these sections does not thwart the legislative purpose of the act. Therefore, under the plain meaning rule, and other dictates of statutory construction, these provisions, must be read as mandatory in nature.

While Indiana case law regarding a board's duty to construct and maintain the necessary fixtures to carry out a particular district plan is sparse, at least one case, and those from other states, provides instruction. *In Matter of Big Raccoon Conservancy Dist.* (1977), 173 Ind.App. 218, 363 N.E.2d 1004, a petition for mandate was filed to compel a board of directors to implement an established conservancy district plan. Noting the oath taken by each director, this court stated that "[t]he Act imposes upon the Board the duty to place the district plan in operation." *Id.* at 223, 363 N.E.2d at 1008. Addressing other issues not relevant to the present case, this court went on to affirm the trial court's grant of summary judgment in the petitioner's favor.

In *Reclamation Dist. No. 1500 v. Superior Court of Sutter County* (1916), 171 Cal. 672, 154 P. 845, the California Supreme Court dealt with an attempt to enjoin the building of a levee. Addressing the question of duty on the part of the board and its directors the court stated:

"It will not be questioned that the act which creates reclamation district No. 1500 is a public statute. It is equally clear that the construction of the levees designated in the act constitutes the execution of such public statute. The injunction complained of restrains the district and its trustees from proceeding with the erection of such levees. The statute does not in terms impose the duty of building the levees upon the trustees. Such construction is declared to be the duty of the district. But, since a corporation, public or private, can act

---

1. Indiana Code section 13–3–3–2 sets out the purposes for which conservancy districts may be established:

"(a) A conservancy district may be established for one (1) or more of the following purposes:
(1) Flood prevention and control.
(2) Improving drainage.
(3) Providing for irrigation.
(4) Providing water supply, including treatment and distribution, for domestic, industrial, and public use.
(5) Providing for the collection, treatment, and disposal of sewage and other liquid wastes.

(6) Developing forests, wildlife areas, parks, and recreational facilities where feasible in connection with beneficial water management.
(7) Preventing the loss of topsoil from injurious water erosion.
(8) Storage of water for augmentation of stream flow.
(9) Operation, maintenance, and improvements of any work of improvement for water based recreational purposes, or other work of improvement that could have been built for any other purpose authorized by this section."

only through its officers or agents, the statutory imposition of a duty upon the district necessarily imposes the duty upon the directing officers of the district."

*Id.* at 675–76, 154 P. at 847. A year later in *Gray v. Reclamation Dist. No. 1500* (1917), 174 Cal. 622, 163 P. 1024, the California Supreme Court noted that the reclamation district had a duty to build certain levees "which by the very charter of its organization it was called upon to build, and which by the acceptance of that charter it became in duty bound to build." *Id.* at 634, 163 P. at 1029.

In *Hayashi v. Alameda County Flood Control and Water Conservation Dist.* (1959), 167 Cal.App.2d 584, 334 P.2d 1048, the California District Court of Appeal addressed the question of maintenance of structures. Finding in favor of landowners whose property was damaged following a break in a levee the court stated that after having constructed the levee the District was under the same duty to maintain it in a reasonable manner as a private landowner would be, at least after notice. *Id.* at 591, 334 P.2d at 1053. Addressing a similar question in *Board of Levee Comm'rs of Orleans Levee Dist. v. Kelly* (1954), 225 La. 411, 73 So.2d 299, the Louisiana Supreme Court found that a board or district, in the discharge of its duty and responsibility in protecting the public against the danger of floods need not wait until the danger is imminent. Instead, the Louisiana court held that a levee board's duty is to maintain the levees at all times in such condition of repair as to avoid all possibility of danger. *Id.* at 422, 73 So.2d at 302. Therefore, as these cases demonstrate, other states have imposed a clear duty on conservancy districts to construct the necessary fixtures to fulfill their purposes and to maintain those fixtures properly.

We find that the Board in the present case has a mandatory duty to complete the project. Under the rules of statutory construction, the wording of the Conservancy Act evidences a mandatory directive to the Board to implement and carry out their Plan. The case of *Big Raccoon,* wherein this court found a definite duty on the part of a board to implement their district plan supports this notion. In addition, other states have found a duty on the part of conservancy district boards and flood control boards to implement and follow through on plans and to maintain the necessary structures. The Petitioners herein all have been assessed and paid the special benefits assessments. However, they have not received the benefits for which they were assessed. The Board does not possess the discretion, midway through the project, to decide that it will only complete some of the Plan. The Board has a mandatory, non-discretionary duty to complete the Plan absent a formal change in the same as it now exists.

We therefore reverse the judgment of the trial court and remand for proceedings consistent with this opinion.

NEAL and SULLIVAN, JJ., concur.