## INDIANA DEPARTMENT OF NATURAL RESOURCES, Appellant–Respondent,

v.

## PEABODY COAL COMPANY, Appellee–Petitioner.

No. 87A05–9402–CV–53.

Court of Appeals of Indiana.

July 28, 1995.

Pamela Carter, Atty. Gen., Myra P. Spicker, Deputy Atty. Gen., Indianapolis, for appellant.

David R. Joest, Peabody Coal Co., Henderson, KY, for appellee.

## OPINION

RUCKER, Judge.

The Department of Natural Resources issued a citation to Peabody Coal Company for alleged violations of certain provisions of the Indiana Surface Mining Control and Reclamation Act. An Administrative Law Judge affirmed the violations and on review the trial court set aside the decision. The DNR now appeals raising five issues which we consolidate and rephrase as follows:

1) Did the trial court err in determining the ALJ misconstrued 310 IAC 12–5–62 which by its terms applies to "regraded and topsoiled areas."

2) Did the trial court err in holding the ALJ's decision, which found Peabody in violation of 310 IAC 12–5–12.1 and 310 IAC 12–5–56.1, was arbitrary and capricious.

We affirm in part and reverse in part.

Peabody Coal Company (Peabody) conducts surface coal mining and reclamation operations at its Lynville mine in Warrick County, Indiana under a permit issued by the Department of Natural Resources (DNR). The permit was issued pursuant to the Indiana Surface Mining Control and Reclamation Act (the "Act") I.C. §§ 13–4.1–1–1 to 15–14. By terms of the Act and regulations promulgated thereunder, operators must salvage topsoil before mining and replace the topsoil after mining as part of the reclamation process. In some instances it is not possible to salvage and then replace topsoil because there is none present. This occurs where the area was mined before the salvaging and replacing of topsoil were required. These areas must be reclaimed using material other than topsoil. Part of the area at issue in this case had been previously mined. And under the terms of its permit, Peabody was reclaiming the area with the best available materials consisting of a "mixture of shale and unconsolidated material." *Record* at 15.

On March 31, 1992, a DNR inspector observed erosion at the Lynville mine in an area identified as the north/south final cut impoundment. Based upon her observations, the inspector issued a Notice of Violation (NOV) to Peabody for "[f]ailure to protect and stabilize replaced topsoil and approved topsoil substitutes to effectively control erosion." *Record* at 24. Peabody was cited for violating the terms of its permit as well as violating five specific regulatory provisions. Peabody then sought administrative review. An Administrative Law Judge (ALJ) determined that Peabody had not violated its permit, nor one of the regulatory provisions for which Peabody had been cited. However, the ALJ affirmed the violations of the following regulatory provisions: 310 IAC 12–5–62; 310 IAC 12–5–12.1(e)(1)(iii); 310 IAC 12–5–56.1(a); and Ind.Code § 13–4.1–8–1(4). Thereafter, Peabody sought judicial review. After conducting a hearing the trial court entered an order vacating the ALJ's decision. The trial court's order was supported by findings of fact and conclusions of law which dictated among other things: 1) 310 IAC 12–5–62 applies only to areas covered by topsoil and thus the ALJ improperly applied this regulation because shale and not topsoil was

used in reclaiming the land; 2) the ALJ's decision construing 310 IAC 12–5–12.1(e) and 310 IAC 12–5–56.1 was arbitrary and capricious in that the decision contravened other ALJ decisions. The DNR now appeals.

■ Judicial review of an administrative decision is limited to determining whether the agency possessed jurisdiction over the subject matter, and whether the agency's decision was made pursuant to proper procedures, was based upon substantial evidence, was not arbitrary or capricious, and was not in violation of any constitutional, statutory or legal principle. *State Bd. of Tax Comm'rs v. Jewell Grain Co., Inc.* (1990), Ind., 556 N.E.2d 920, 921.

## I.

■ The ALJ determined that Peabody violated 310 IAC 12–5–62 which provides in relevant part: "Revegetation: Mulching and Other Soil Stabilizing Practices. (a) Suitable mulch or other necessary soil stabilizing practices shall be used on all regraded and *topsoiled* areas...." (emphasis added). On review, the trial court held that the ALJ misconstrued this provision because Peabody used shale rather than topsoil to reclaim the area. Topsoil is specifically defined by the regulatory codes, *see* 310 IAC 12–0.5–133, and does not include shale. DNR does not contend the materials Peabody used to reclaim the area surrounding the final cut satisfy the statutory definition of topsoil. Rather, DNR argues that because 310 IAC 12–5–62 was adopted to facilitate restoration of vegetation to a mined area, the word "topsoil" applies to any medium in which vegetation will grow.

■ The rules applicable to construction of a statute apply as well to construction of an administrative regulation. *Indiana Dep't of Pub. Welfare v. Payne* (1993), Ind., 622 N.E.2d 461, 465, *reh'g denied; Peabody Coal Co. v. IDNR* (1994), Ind.App., 629 N.E.2d 925, 930, *reh'g denied.* Therefore just as we are bound by the definition of a word specifically defined by statute, we are also bound by the definitions in regulations regardless of other possible meanings attributed to the defined word. *Tillman v. Snow* (1991), Ind. App., 571 N.E.2d 578, 580. In this case,

because "topsoil" is defined by regulation, we are bound by the definition and may not assign additional meanings to the term. *See Peabody,* 629 N.E.2d at 930; *Tillman,* 571 N.E.2d at 580. The trial court properly determined that 310 IAC 12–5–62 did not apply to the facts of this case.

■ DNR counters that notwithstanding the definition of the term "topsoil," Peabody nonetheless violated 310 IAC 12–5–62 because the area surrounding the final cut did contain some amount of topsoil which was eroding. Thus, according to DNR, mulching and soil stabilization was required in the affected areas. DNR's claim on this point amounts to an invitation for this court to reweigh the evidence. It is the role of the agency to act as fact finder in an administrative proceeding and as a reviewing court, we do not substitute our judgment on factual matters for that of the agency. *Peabody Coal Co. v. IDNR* (1994), Ind.App., 640 N.E.2d 435, *reh'g denied; IDNR v. United Refuse Co.* (1993), Ind., 615 N.E.2d 100, 104; I.C. § 4–21.5–3–27(b). We are bound by the facts as found by the administrative agency and may not reweigh the evidence or judge the credibility of witnesses. *Public Service Co. of Indiana, Inc. v. Review Bd.* (1983), Ind.App., 451 N.E.2d 371, 374. Administrative findings of fact will not be reversed unless it conclusively appears the evidence upon which the decision was made was devoid of probative value or so proportionately inadequate that the finding could not rest on a rational basis. *Indiana Alcoholic Beverage Comm'n v. River Road Lounge* (1992), Ind. App., 590 N.E.2d 656, 658, *trans. denied.*

The ALJ heard conflicting evidence concerning which areas around the final cut impoundment contained topsoil and whether Peabody had mulched these areas. Based upon this evidence, the ALJ found only that "[m]uch of the surface in this area is alternative material (mostly shale), not top soil." *Record* at 48. The ALJ did not find that topsoil composed part of the surface area which was eroding. The DNR does not contend nor does the record reveal that the evidence upon which the ALJ's decision was based was devoid of probative value or so

proportionately inadequate that the finding could not rest on a rational basis. Rather, DNR relies upon on an additional fact not found by the ALJ, namely, that topsoil composed part of the surface area which was eroding. We decline the invitation to reweigh the evidence. There is no error here.

## II.

DNR next contends the trial court erred in holding that Peabody was not in violation of Ind.Code § 13–4.1–8–1(4), 310 IAC 12–5–12.1 and 310 IAC 12–5–56.1. Contrary to DNR's contention the trial court did not hold that Peabody was not in violation of I.C. § 13–4.1–8–1(4). In fact the trial court made no specific finding concerning this statute. Also, as Peabody correctly points out, the trial court did not hold that Peabody was not in violation 310 IAC 12–5–12.1 and 310 IAC 12–5–56.1. Rather, the trial court determined only that the ALJ's order was arbitrary and capricious because the ALJ construed the two provisions in a manner inconsistent with prior DNR administrative decisions and did not explain or justify the inconsistency. DNR counters the trial court also indicated "[t]he Administrative Law Judge's decision is arbitrary and capricious insofar as it holds that [Peabody] violated 310 IAC 12–5–12.1 and 12–5–56.1." *Record* at 366. According to DNR it is unclear from this sentence whether the arbitrary and capricious language "simply referred to an alleged 'inconsistency' with previous ALJ decisions or whether this was a flat-out finding by the trial court of non-violation." *Reply Brief of Appellant* at 4. DNR reads too much into this single sentence which appears as the last sentence of the trial court's Conclusion of Law number six. That conclusion sets forth in some detail why the trial court believed the ALJ's decision was arbitrary and capricious, namely, inconsistency with prior DNR administrative decisions. The final sentence simply reaffirmed that point.

In any event, citing *Community Care Centers, Inc. v. Indiana Dep't of Public Welfare,* (1988) Ind.App., 523 N.E.2d 448, Peabody argues the trial court properly determined the ALJ's order was arbitrary and capricious. In that case the Indiana Department of Public Welfare denied a nursing home operator's request for an adjustment of the Medicaid rate base. Appealing from an adverse administrative ruling as well as an adverse trial court ruling, the nursing home operator complained that the Department's action was arbitrary and capricious because it was inconsistent with several other decisions made by the Department. We reversed. In so doing we cited with approval several federal court cases and observed:

> It is well-established under federal law that agencies are free to change past rulings and policies. [citation omitted]. Clearly, an agency should not be bound by prior policy when that policy proves to be flawed or in need of change. However, a change in policy must be explained and the reasons therefor articulated. [citation omitted].

*Id.* at 451. Peabody seizes on the forgoing language and argues it requires an affirmance of the trial court in this case. We disagree. The cases are distinguishable. In *Community* the record showed that the Department had "no written standards setting forth the specific standards used in reviewing rate requests, was vacillating on its policy with regard to rate requests at the time of the Hamilton Heights transaction, and proceeded to determine rate requests using its uncontrolled discretion. . . ." *Id.* at 451. Indeed not until months after the nursing home operator made its request did the Department finally promulgate rules explicitly setting forth who would be entitled to reimbursement and the criteria needed in order to qualify for a new rate base. *Id.* at 452.

In this case the Natural Resources Commission had promulgated rules to implement Indiana's Surface Mining Control and Reclamation Act well in advance of Peabody receiving the NOV. Unlike the situation in *Community,* here the rules are in writing and explicitly set forth specific standards governing coal mining and reclamation operations. *See* Article 12 Section 310 of the Indiana Administrative Code.

The facts here are more analogous to those in *State Bd. of Registration for Land Surveyors v. Bender* (1993), Ind.App., 626 N.E.2d 491. In that case we reversed

the trial court's determination that the Board of Registration acted arbitrarily and capriciously in treating one applicant for a land surveyor's license differently than it had treated another applicant who was similarly situated. We concluded that the action of an administrative agency is arbitrary and capricious only where there is no reasonable basis for the action. *Id.* at 496 citing *Board of Trustees of P.E.R.F.* (1983), Ind.App., 450 N.E.2d 95. We also observed that the prior and inconsistent decision had not been subjected to judicial review and reasoned "[c]ertainly if the Board's decision were erroneous, future boards would not then be forever bound to make the same erroneous decision." *Id.* at 497. We reach the same conclusion here. Thus, the question is not whether the DNR acted arbitrarily and capriciously because it rendered inconsistent rulings. Rather, the relevant inquiry is whether there was a reasonable basis for the DNR's action in this case. Of course where the action of an administrative agency is based on the agency misconstruing a statute, then there is no reasonable basis for the action and it is therefore deemed arbitrary and capricious. *See Baughman,* 450 N.E.2d at 97–98. We give considerable weight to an administrative agency's interpretation of a statute which the agency is charged with enforcing. *Indiana Gas Co., Inc. v. Utility Consumer Counselor* (1993), Ind.App. 610 N.E.2d 865.

The ALJ found that Peabody was in violation of 310 IAC 12–5–12.1 which provides in pertinent part:

(a) Removal. All topsoil shall be removed as a separate layer from the area to be·disturbed and segregated.

(1) Where the topsoil is of insufficient quantity or of poor quality to sustain vegetation, the material approved by the commission or by the director as a topsoil substitute or supplement in accordance with paragraph (c) of this rule shall be removed separately from the area to be disturbed, and segregated.

\* \* \*· \* \* \*

(c) Substitutes and supplements. Selected overburden materials may be substituted for, or used as a supplement to, topsoil if the permittee demonstrates to

the commission in the permit application or to the director that the resulting soil medium is equal to or more suitable for sustaining vegetation than the existing topsoil.

\* \* \* \* \* \*

(e) Redistribution. (1) Topsoil materials removed under paragraph (a) of this rule shall be redistributed in a manner that:

\* \* \* \* \* \*

(iii) protects the materials from wind and water erosion before and after seeding and planting.

Specifically, the ALJ determined that section (e)(1)(iii) requires that topsoil materials must be redistributed in a manner that protects the material from wind and water erosion and that (e)(1)(iii) applied to alternative or substituted materials.

Peabody contends the ALJ misconstrued 310 IAC 12–5–12.1(e)(1)(iii) because the provision refers to "topsoil materials" and here Peabody was not using "topsoil materials" but rather was using "best available materials." According to Peabody the terms are different and apply in different contexts. In Peabody's view "topsoil materials" are equated to "topsoil substitutes" or "topsoil supplements" which must meet certain vegetation suitability requirements based on chemical and physical analyses. On the other hand, Peabody argues, "best available materials" which are governed by 310 IAC 12–5–64(c)(1), are not subject to those requirements.

Peabody's argument is not persuasive. We first observe the term "best available material" is found neither in 310 IAC 12–5–64(c)(1) nor the 1990 replacement, 310 IAC 12–5–64.1(c)(1). Rather, the provisions refer to "best available topsoil" and "other suitable material." In any event, the question still remains whether the term "topsoil materials" as the term appears in 310 IAC 12–5–12.1(e)(1)(iii) includes the shale and unconsolidated material Peabody was using here regardless of whether they are designated as "best available materials" or given some other designation.

When construing a statute or an administrative regulation, this court is guided by several rules of statutory construction. First, it must be noted that when a statute is clear and unambiguous, on its face, the court need not, and indeed must not interpret the statute. *Whitacre v. State of Indiana and IDNR* (1993), Ind.App., 619 N.E.2d 605 adopted (1994), 629 N.E.2d 1236. When a statute is ambiguous, the court must ascertain the intent of the legislature and interpret the statute to effectuate that intent. *Economy Oil Corp. v. Indiana Dep't of State Revenue* (1974), 162 Ind.App. 658, 321 N.E.2d 215. When so doing we read the statutes as a whole and attempt to give effect to all provisions. *Id.* A statute is ambiguous, and thus open to judicial construction, when it is susceptible to more than one interpretation. *Amoco Production Co. v. Laird* (1993), Ind., 622 N.E.2d 912. Also, where the legislature has used a word without definition, we must examine the statute as a whole and attribute the common and ordinary meaning to the undefined word, unless doing so would deprive the statute of its purpose and effect. *Consolidation Coal Co. v. Indiana Dep't of Revenue* (1991), Ind., 583 N.E.2d 1199. In this case the term "topsoil materials" is not defined by statute. Further, as evidenced in part by the parties' spirited debate, the regulatory code here in question is subject to more than one interpretation and is therefore ambiguous.

One of the underlying purposes of the Act is to assure that an area is successfully revegetated after a mining operation has been completed. *See e.g.,* Ind.Code 13–4.1–8–1(2) (an operator shall "restore the land affected to a condition capable of supporting the uses which it was capable of supporting prior to any mining or higher or better uses...."); I.C. 13–4.1–8–1(5) ("[I]f the topsoil is of insufficient quantity or of poor quality to sustain vegetation ... the operator shall remove, segregate, and preserve [in the same manner employed for topsoil] the strata which are best able to support vegetation."); I.C. 13–4.1–8–1(6) (The operator shall "[r]estore the topsoil or the best available subsoil which is best able to support vegetation.") The Act makes clear there is a need to insure that reclamation of mined lands includes the use of a growth medium which will support vegetation. Whether the medium is characterized as "best available material," "topsoil substitute," or "other suitable material" the purpose is nonetheless the same, namely, to insure to the degree possible, successful revegetation.

In this case we interpret "topsoil material" to mean "the material approved by the commission or by the director as a topsoil substitute or supplement...." 310 IAC 12–5–12.1(a)(1). Whether the material Peabody used in this case has been so approved is not before us. We decide only that whatever material is used, it (1) requires DNR approval and (2) "shall be redistributed in a manner that ... protects the materials from wind and water erosion before and after seeding and planting." 310 IAC 12–5–12.1(e)(1)(iii). The ALJ properly construed the foregoing provision and evidence before the ALJ supported his determination that Peabody was in violation of the provision. Because there was a reasonable basis for the ALJ's decision it was not arbitrary and capricious. The trial court's judgment to the contrary is erroneous and must be reversed.

We next address whether the ALJ properly construed 310 IAC 12–5–56.1(a) which provides "[a]ll exposed surface areas shall be protected and stabilized to effectively control erosion and air pollution attendant to erosion." The ALJ determined that the provision imposed a duty on Peabody to protect and stabilize exposed areas both to control erosion and to control air pollution attendant to erosion. Peabody does not contend it protected the subject area from erosion. Rather, Peabody argues the foregoing provision only applies where the erosion would cause air pollution or other environmental problems. There was no evidence of air pollution or other environmental problems in this case.

In support of its interpretation Peabody directs our attention to the history of the federal SMCRA on which the Indiana Act is based. Peabody then concludes that such history supports its conclusion that the Act was intended to regulate air pollution only to the extent that it resulted from erosion, as opposed to mining processes. First, we find nothing in the history of the federal SMCRA or in the federal regulatory codes cited by Peabody which supports its interpretation of

310 IAC 12–5–56.1(a).[1] Be that as it may, Peabody's analytical approach to this issue is based on a faulty premise, namely, that we must discern the intent of the legislature by examining the goals sought to be achieved and the reasons and policies underlying the statute. *See e.g., Matter of Middlefork Watershed Conservancy Dist.* (1987), Ind.App., 508 N.E.2d 574 *reh'g denied.* We engage in that exercise only where a statute is ambiguous. *Economy Oil Corp.*, 321 N.E.2d at 218. When a statute is clear and unambiguous on its face we may not interpret the statute; rather, the statute is held to its clear and plain meaning. *Scheub v. Town Schererville* (1993), Ind.App., 617 N.E.2d 585, *reh'g denied; Whiteacre*, 619 N.E.2d at 606. Here 310 IAC 12–5–56.1(a) unambiguously declares "[a]ll exposed surface areas shall be protected and stabilized to effectively control erosion and air pollution attendant to erosion." The use of the conjunction "and" between "erosion" and "air pollution" clearly means that an operator must control erosion in addition to pollution caused by erosion. The ALJ properly construed 310 IAC 12–5–56.1(a) and evidence before the ALJ supported his determination that Peabody was in violation of the provision. Again there was a reasonable basis for the ALJ's decision and therefore it was not arbitrary and capricious. The trial court's judgment to the contrary is erroneous and must be reversed.

Judgment affirmed in part and reversed in part.

SHARPNACK, C.J., and GARRARD, J., concur.

---

1. Congress adopted the Surface Mining Control and Reclamation Act (SMCRA) in 1977 to ensure that production of coal for interstate commerce would not be at the expense of agriculture, the environment, or public health and safety. *Hodel v. Indiana*, 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981). In the Midwest, the practice of mining coal without restoring the land upon completion of the process had caused adverse environmental effects such as degradation of farmland, pollution of streams by acid drainage from abandoned mines, recurrent landslides, deforestation, destruction of wildlife habitat, siltation and sedimentation of the river systems, and the destructive movement of boulders. H.R.Rep. No. 95–128, 95th Cong., 1st Sess., (1977), reprinted in 1977 U.S.C.C.A.N. 593, 596. In enacting SMCRA, Congress sought to prevent water and air pollution as well as to preserve the productive capacity of mined lands and to protect the public from health and safety hazards resulting from surface coal mining. *Hodel*, 452 U.S. at 327, 101 S.Ct. at 2384–85. Preventing air and water pollution was only one concern addressed by the federal Act. *Id.* at 326, 101 S.Ct. at 2384.