**STATE of Indiana, The Honorable Pamela A. Carter, and the Indiana Department of Transportation, Fred P'Pool, Commissioner, Appellants–Defendants,**

**v.**

**Shannon LIVENGOOD, a minor, by Dennis and Judy LIVENGOOD, Co–Guardians; Holly Johnson, a minor, by Elizabeth Johnson, Guardian; Dennis Livengood and Judy Livengood, as parents of Jerry Livengood, Deceased, Appellees–Plaintiffs.**

No. 15A01–9612–CV–412.

Court of Appeals of Indiana.

Nov. 13, 1997.

190

Jeffrey A. Modisett, Attorney General, Christopher L. Lafuse, Deputy Attorney General, Indianapolis, for Appellants–Defendants.

James A. Goodin, Goodin & Kraege, Indianapolis, for Appellees–Plaintiffs.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

As the result of a car accident, Shannon Livengood, a minor, by Dennis and Judy Livengood, Co–Guardians, Holly Johnson, a minor, by Elizabeth Johnson, Guardian, and Dennis and Judy Livengood, as parents of Jerry Livengood, Deceased, (collectively, "Plaintiffs") brought suit against the State and the Indiana Department of Transportation (collectively, "the State") under the Indiana Tort Claims Act. The State filed a motion for summary judgment. The trial court denied the motion, and we granted the

State's petition for interlocutory appeal under Indiana Appellate Rule 4(B)(6).

We affirm in part, reverse in part and remand.

## ISSUES

The State presents two issues for our review which we restate as:

1. Whether the State is immune from suit based on twenty-year design immunity.

2. Whether the State is immune from suit based on discretionary function immunity.

## FACTS

On January 27, 1992, at approximately 11:25 a.m., Jerry and Shannon Livengood, Holly Johnson and Jeremy Smith were riding in a car driven by Troy Russell. While attempting to exit Interstate 74 at the Brookville Interchange, Exit 169, Russell's car slid off the road. The car struck the guardrail, which "speared" the car and tore it in half.[1] Jerry and Troy were killed in the accident, and Shannon and Holly suffered multiple injuries, including the traumatic amputation of their legs. An autopsy later revealed that Troy had a blood alcohol content of .29 percent.

On July 1, 1993, the Plaintiffs filed a complaint against the State which alleged that the State had negligently designed, constructed and maintained Exit 169 and the guardrail installed there. The State raised the defenses of twenty-year design and discretionary function immunity and moved for summary judgment. The trial court denied the motion, and the State appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### Standard of Review

Summary judgment is appropriate only if the designated evidentiary materials show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law. Ind. Trial Rule 56(C). When reviewing a motion for summary judgment, we apply the same standard as the trial court, and we resolve any doubt as to any fact, or inference to be drawn therefrom, in favor of the non-moving party. *Scott v. City of Seymour,* 659 N.E.2d 585, 588 (Ind.Ct.App.1995). We must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. *Id.* The party seeking summary judgment bears the burden of establishing the propriety of the motion. *Id.*

### Governmental Immunity

 Governmental immunity from suit is regulated by the Indiana Tort Claims Act ("the Act"), Indiana Code §§ 34–4–16.5–1 through 34–4–16.5–22. Pursuant to the Act, governmental entities are subject to liability for torts committed by their agencies or employees unless one of the immunity provisions of the Act applies. *Scott,* 659 N.E.2d at 588. The entity seeking immunity bears the burden of proving that its conduct falls within one of the exceptions set out in the Act. *Id.* Because the Act in is derogation of the common law, it is narrowly construed against the grant of immunity. *Jacobs v. Board of Comm'rs of Morgan County,* 652 N.E.2d 94, 98 (Ind.Ct.App.1995), *trans. denied.* Whether a governmental entity is immune from liability is a question of law for the courts, although it may include an extended factual development. *Peavler v. Board of Comm'rs of Monroe County,* 528 N.E.2d 40, 46 (Ind. 1988).

### 1. *Design Immunity*

 The State first claims immunity under Indiana Code § 34–4–16.5–3(16). According to that provision of the Act, when the claimed loss results from the design of a public highway, the State is immune from suit if the loss occurs at least twenty years after the highway was "designed or substan-

---

1. The Exit 169 guardrail is located on the north side of the exit ramp. The evidence shows that the car first impacted with the guardrail's western "end-treatment," which then speared and severed the car. The rear half of the car came to rest near the area of impact, and the front half came to rest approximately 206 feet from the rear half. Record at 45. The police report indicates that the car had been traveling between 75 and 97 m.p.h. at the time of the accident. However, Plaintiffs dispute that fact. *Id.*

tially redesigned." *Jacobs,* 652 N.E.2d at 98. The State maintains that design immunity applies in this case because the guardrail on Exit 169 was designed and constructed approximately thirty years before the accident occurred. Plaintiffs counter that the State substantially redesigned the guardrail in 1980 when it removed 102.5 feet of the original guardrail and replaced it with a 37.5–foot Breakaway Cable Terminal ("BCT") end-treatment in an effort to comply with prevailing safety standards.[2]

The Act does not define the phrase "substantially redesign." Therefore, we must determine its meaning. When construing a statute, we are guided by several rules of statutory construction. First, it must be noted that when a statute is clear and unambiguous on its face, the court need not, and indeed must not, interpret the statute. *Indiana Dep't of Natural Resources v. Peabody Coal Co.,* 654 N.E.2d 289, 295 (Ind. Ct.App.1995). When a statute is ambiguous, the court must ascertain the intent of the legislature and interpret the statute to effectuate that intent. *Id.* When so doing, we read the statute as a whole and attempt to give effect to all its provisions. *Id.* A statute is ambiguous and, thus, open to judicial construction, when it is susceptible to more than one interpretation. *Amoco Production Co. v. Laird,* 622 N.E.2d 912, 915 (Ind.1993). Also, where the legislature has used a word without definition, we must examine the statute as a whole and attribute the common and ordinary meaning to the undefined word, unless so doing would deprive the statute of its purpose and effect. *Consolidation Coal Co. v. Indiana Dep't of Revenue,* 583 N.E.2d 1199, 1201 (Ind.1991).

Webster's defines "redesign" to mean "to revise in appearance, function or content." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1902 (1976). "Substantial," the derivative of "substantially," is defined as "an important or material matter, thing or part; of or relating to the main part of something." *Id.* at 2280. Applying that definition, Plaintiffs maintain that the State revised the appearance, function and content of the guardrail and that the revisions affected an important or material part of the guardrail.

In support of their argument, Plaintiffs rely on a report prepared by Maurice Bronstad, an expert in highway safety engineering and design and one of the chief designers of the BCT end-treatment. After an inspection of the crash site, Bronstad concluded that the exit ramp, guardrail and BCT end-treatment failed to conform to prevailing federal and state highway safety standards. First, Bronstad stated that the original construction drawings of Exit 169 did not include placement of a guardrail along the north side of the exit ramp and that the State was negligent in placing a guardrail there. His report stated that the guardrail:

[W]as presumably placed for the embankment hazard on the left side of the ramp; however, an evaluation of the gore area indicates that considerably more of the guardrail should have been removed before placing the BCT. *The gore area in the vicinity of the accident guardrail was traversable and did not warrant guardrail placement.*

Record at 86 (emphasis added). Bronstad concluded that the guardrail extended at least 150 feet closer to the entrance of the ramp than was necessary, based upon a survey of Exit 169 and the layout procedures from INDOT's Roadway Design Manual and from the 1977 American Association of State Highway Traffic Official's (AASHTO) Barrier Guide. Thus, asserted that the guardrail itself became a greater hazard than the risk that vehicles would leave the exit ramp.

Second, Bronstad stated that the State had improperly designed and installed the BCT end-treatment. *Id.* He asserted that the State had failed to follow the federal highway safety standard which requires the use of a

---

2. Plaintiffs do not argue that a guardrail does not constitute a "highway" for purposes of the Act. Black's Law Dictionary states that "the term "highway" as it is generally understood, includes areas other than and beyond the boundaries of the paved surface of a roadway." BLACK'S LAW DICTIONARY 728 (6th ed.1990) (citing *Opinion of the Justices to the Senate,* 370 Mass. 895, 352 N.E.2d 197, 201 (1976)). Thus, we conclude that under the Act a highway includes a guardrail located adjacent to an exit ramp.

four-foot parabolic curve in the design and installation of the BCT end-treatment. Bronstad maintained that a four-foot parabolic curve is necessary to promote guardrail beam buckling and to prevent the guardrail from "spearing" vehicles upon impact. Bronstad concluded that "there is every reason to believe that the vehicle would not have struck the guardrail [end-treatment] with the resulting severe vehicle damage" if the State has not installed the guardrail in the first instance or if it had used the proper parabolic curve for the end-treatment. Record at 86.

The State counters that installation of the BCT end-treatment constituted mere "maintenance" which did not substantially redesign the existing guardrail. We are not persuaded by that argument. Bronstad's report indicates that BCT, if properly used, is designed to prevent the "spearing" effect that had been caused by traditional vertical end-treatments. The designated evidence shows that the BCT end-treatment has characteristics, requires specifications and implicates engineering and design concerns different from the guardrail's original end-treatment. Whether the State properly designed and installed the BCT end-treatment is a question that can be answered independently of whether the original guardrail was itself properly designed and installed. We conclude that the State substantially redesigned the guardrail in 1980 when it removed over 100 feet of the existing guardrail and installed the BCT end-treatment. Those changes constitute a revision in the appearance, function and content of a material part of the guardrail. Thus, the State is not immune from suit under twenty-year design immunity.

We also conclude that the State is only subject to liability to the extent that Plaintiffs' claim for negligence arises from the BCT end-treatment. As we have already noted, Plaintiffs maintain that Exit 169 does not require the use of a guardrail along the north side of the ramp. Accordingly, they argue that the State was negligent in constructing and maintaining the allegedly unwarranted guardrail. Plaintiffs do not dispute that the State constructed the guardrail in the early 1960s. Presumably, then, twenty-year design immunity shields the State from liability for injuries caused by the mere existence of the guardrail at Exit 169. However, Plaintiffs contend that the State ratified the original guardrail's construction and placement when it installed the BCT end-treatment in 1980. We do not agree.

The designated evidence shows that the State did not undertake a complete reevaluation of the guardrail's placement when it installed the end-treatment. Rather, the State concentrated its efforts on the design and installation of the end-treatment, and those efforts did not revive previous acts of negligence, if any, which occurred over twenty years before the accident. The State would be discouraged from improving its highways if the substantial redesign of part of a project would revive the twenty-year statute of limitations with respect to the entire project. We conclude that the State is immune from liability to the extent that Plaintiffs' case rests on the State's allegedly negligent construction of the original guardrail.

2. *Discretionary Function Immunity*

The State also claims that it is immune from suit based upon Indiana Code § 34–4–16.5–3(6) which provides that "a governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from ... the performance of a discretionary function." In *Peavler v. Monroe County Bd. of Comm'rs,* 528 N.E.2d 40 (Ind.1988), our supreme court adopted the "planning/operation" test to determine whether a particular governmental act is discretionary and entitled to immunity. Essentially, the test provides that a governmental act is immune from liability when the alleged negligence arises from decisions which are made at the planning level, as opposed to the operational level. *Scott,* 659 N.E.2d at 588–89. A decision of a governmental entity is a "planning function" if it involves the formulation of basic policy characterized by official judgment, discretion, the weighing of alternatives and public policy choices. *Peavler,* 528 N.E.2d at 45. Operational functions, in contrast, are characterized by the execution or implementation of a

previously formulated policy. *Lake County Juvenile Court v. Swanson,* 671 N.E.2d 429, 439 (Ind.Ct.App.1996), *trans. denied.* The court in *Peavler* further explained:

> [I]mmunity for discretionary functions under the planning/operation test does not extend to all acts involving choice or judgment. . . .
>
> . . . .
>
> . . . The discretionary function exception insulates only those significant policy and political decisions which cannot be assessed by customary tort standards. In this sense, the word discretionary does not mean mere judgment or discernment. Rather, it refers to the exercise of political power which is held accountable only to the Constitution or the political process.

*Peavler,* 528 N.E.2d at 44–45 (citing *Miller v. United States,* 583 F.2d 857, 866–67 (6th Cir.1978)).

▮▮▮▮ The planning/operation test is not a bright line test but instead focuses upon the particular circumstances of each case. *Mullin v. Municipal City of South Bend,* 639 N.E.2d 278, 281 (Ind.1994). The governmental unit bears the burden of proving that the challenged act or omission was a policy decision made by consciously balancing risks and benefits. *Peavler,* at 46. Merely labeling an action as planning or operational, without more, cannot pass for analysis. *Id.* at 45. In deciding whether the function is the type intended to benefit from immunity, the court should look to the purposes of immunity to determine whether those purposes would be furthered by extending immunity to the act in question. *Id.* at 46. Factors which would, under most circumstances, point toward immunity, include:

1. The nature of the conduct—

 a) Whether the conduct had a regulatory objective;

 b) *Whether the conduct involved the balancing of factors without reliance on a readily ascertainable rule or standard;*

 c) *Whether the conduct requires a judgment based on policy decisions;*

 d) Whether the decision involved adopting general principles or only applying them;

 e) Whether the conduct involved establishment of plans, specifications and schedules; and

 f) *Whether the decision involved assessing priorities, weighing of budgetary considerations or allocations of resources.*

2. The effect on governmental operations—

 a) Whether the decision affects the feasibility or practicability of a government program; and

 b) Whether liability will affect the effective administration of the function in question.

3. *The capacity of the court to evaluate the propriety of the government's action—*

 *Whether tort standards offer an insufficient evaluation of the plaintiff's claim.*

*Id.* (emphasis added).

▮▮▮▮ In the present case, the parties' arguments focus on Indiana highway standard GR 10A. Adopted in 1979, GR 10A governs the installation of BCT end-treatments and allows INDOT to use a parabolic curve ranging from one to four feet, with a four-foot curve being preferable. The State argues that its decision to adopt GR 10A occurred at the planning level and that the State is immune from liability for any alleged negligence that arises from that decision.

In support of its argument, the State presented the affidavits of several INDOT employees which outline the deliberation process used by the State in the adoption of a given standard. Upon receipt of a proposed standard, INDOT'S standards engineer reviews the merits of the proposal. Record at 57. If deemed meritorious, a draft proposal is prepared and circulated to INDOT personnel for objections, revisions and amendments which the standards engineer then considers. *Id.* The standards engineer further refines the proposal and submits it to INDOT's chief engineer for formal approval. *Id.*

The chief engineer then convenes a committee that consists of himself, the standards engineer and the staff engineer. Record at 62. The committee reviews the proposed standard and considers "all of the social, economic, political, and public policy concerns

which may be caused by the approval of the standard." *Id.* INDOT's current chief engineer, Donald Lucas, testified that the committee would have followed that procedure in the adoption of standard GR 10A. Lucas further explained the specific factors considered by the committee with respect to GR 10A:

> [W]hen the approval committee met in 1979 to consider the adoption of revised guardrail end-treatment standard GR 10A, the following issues would have been critical to the State's decision: 1) whether the guardrail end treatment standard was approved by the Federal Highway Administration; 2) whether other surrounding states had adopted this particular standard of guardrail end treatment; 3) whether the in-service performance of the guardrail end treatment in other states was satisfactory; 4) whether the guardrail end-treatment had been crash tested and the results of those crash tests; 5) whether crash testing was approved by the Federal Highway Administration; 6) whether this standard of guardrail end treatment has received approval by a majority of the engineering community; 7) whether the cost of implementing the standard is manageable; 8) whether INDOT has the physical resources to implement the standard; 9) whether the approval of the standard would create and [sic] political problems, such as general public resistance to the policy; and 10) whether the standard would create any public safety concerns which may not have been identified by other sources.

Record at 63.

■ Plaintiffs counter that the federal highway standard in effect in 1979 required a four-foot parabolic curve. As already noted, Bronstad testified that the use of anything less than a four-foot curve would negate the intended safety effects of the end-treatment.[3] However, Plaintiffs' reliance on that evidence is misplaced. Whether the State was negligent in adopting GR 10A is irrelevant for purposes of immunity. *See Peavler,* 528

N.E.2d at 46 ("Immunity assumes negligence but denies liability."). The proper focus of our inquiry is not the wisdom of the State's decision but rather the nature of the decision itself and the process used to reach it. *See Swanson,* 671 N.E.2d at 439.

Here, the State has presented evidence that the adoption of a highway safety standard necessitates the consideration of many different factors, some of which cannot be evaluated by customary tort standards. The record demonstrates that the adoption of GR 10A implicated the type of policy-oriented deliberation process that discretionary function immunity was designed to protect from judicial scrutiny. Accordingly, we conclude that the State is immune from liability for any alleged negligence that arose from the adoption of GR 10A.

■ Our inquiry is not yet complete. The question remains whether the State is immune from liability for the allegedly negligent design and installation of the particular BCT end-treatment used at Exit 169. Our supreme court's decision in *Peavler* is instructive on that question. In *Peavler,* the court examined whether the State should be immune from liability for its failure to place traffic control devices on certain county roads. The court acknowledged that decisions regarding traffic signs do not always implicate an affirmative policy decision. *Peavler,* 528 N.E.2d at 47. Accordingly, the court concluded that discretionary function immunity is appropriate only in those cases in which the State engaged in a policy oriented deliberation process to determine the appropriate use of traffic control devices. *Id.* The court further stated:

> Tort standards of reasonableness do not provide an adequate basis for evaluating the failure to erect a warning sign if that failure arises from an actual, affirmative policy decision. If the decision is based on professional judgment, however, rather than policy-oriented decision-making, traditional standards for professional negligence afford a basis for evaluation. *Thus, a county's considered decision to entrust*

---

3. Plaintiffs also allege that the State failed to comply with its own standard when it designed and installed the end-treatment. Bronstad testified that the State used a "tapered two foot offset, rather than the parabolic flared offset as required by INDOT GR 10A." Record at 21.

*placement of traffic control devices to a traffic engineer is not reviewable under tort standards, while the engineer's subsequent decisions as to warning signs are reviewable under tort standards of professional negligence.*

*Id.* (emphasis added).

Here, the evidence establishes that to perform an end-treatment replacement contract, the State employs a field engineer who must inspect the exit to determine the proper design and placement of the end-treatment. Record at 53. GR 10A allows the engineer to choose the appropriate parabolic curve for each BCT end-treatment. However, the engineer does not have the authority to reevaluate the guardrail design in its entirety. *Id.* Rather, the engineer is only required "to evaluate those conditions and concerns *directly relevant* to guardrail end-treatment installation...." Record at 53 (emphasis in original). Further, in making a decision, the engineer is restricted by the BCT end-treatment standard. Although the engineer must use his professional judgment to design and install the end-treatment, his decision does not implicate the policy-oriented deliberation process necessary to trigger immunity. Thus, while the State is immune from liability for the adoption of standard GR 10A, the State is not immune from liability for negligence that relates to the specific application of that standard at Exit 169. *See Swanson,* 671 N.E.2d at 439, *discussed infra.*

### CONCLUSION

In sum, we conclude that the State is immune to the extent that Plaintiffs allege negligence in the design and placement of the original guardrail and in the adoption of GR 10A. However, the State is not immune to the extent that Plaintiffs allege negligence in the design and installation of the BCT end-treatment at Exit 169. Additionally, genuine issues of material fact exist with respect to Plaintiffs' remaining claims. Accordingly, we affirm in part, reverse in part and remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

ROBERTSON and STATON, JJ., concur.