**U.S. OUTDOOR ADVERTISING COMPANY, INC., Appellant–Petitioner,**

v.

**INDIANA DEPARTMENT OF TRANSPORTATION, Appellee–Respondent.**

No. 49A02–9803–CV–276.

Court of Appeals of Indiana.

Aug. 20, 1999.

William N. Ivers, Richard Winegardner, Marjorie Lawyer–Smith, Stewart & Irwin, Indianapolis, Indiana, Attorneys for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Jon Laramore, Janet L. Parsanko, Deputy Attorneys General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

BROOK, Judge

### Case Summary

Appellant-petitioner U.S. Outdoor Advertising Company, Inc. ("U.S.Outdoor") appeals the trial court's affirmance of the decision of appellee-respondent Indiana Department of Transportation ("INDOT" or "the department") to deny two of U.S. Outdoor's applications for outdoor advertising sign permits. We remand this cause to the department for additional factual findings.

### Issues

U.S. Outdoor raises six issues for our review, which we combine and restate as follows:

(1) whether INDOT erroneously denied U.S. Outdoor's applications for outdoor advertising sign permits;

(2) whether INDOT was equitably estopped from denying the permit applications;

(3) whether INDOT violated U.S. Outdoor's due process rights;

(4) whether INDOT's denial of the permit applications deprived U.S. Outdoor of its right to free speech and equal protection; and

(5) whether INDOT's denial of the permit applications constituted an unconstitutional taking without just compensation.

### Facts and Procedural History

The facts most favorable to the judgment indicate that on December 22, 1993, I–69, Inc. ("I–69," later known as "ABC Partners") applied to INDOT for outdoor advertising sign permits for two of their billboards located along Interstate 70 in Hancock County, Indiana: for the sake of convenience, we shall refer to these billboards as "the Shelby sign" and "the Bodkin sign."[1] By filling out the permit form, I–69 simultaneously applied for registration of the signs under IND.CODE § 8–23–20–25, which requires registration by December 31, 1993, of all outdoor advertising signs in existence on July 1, 1993, along federally-regulated and interstate highways. The General Assembly passed IND.CODE §§ 8–23–20–1 to –26 ("the Billboard Act") to comply with federal regulation of billboards and signs "in areas adjacent to the interstate and primary highway systems" under 23 U.S.C. § 131 and 23 C.F.R. § 750. IND.CODE § 8–23–20–1. INDOT subsequently adopted IND. ADMIN. CODE 105, 7–3–1 to –13 to "regu-

late the erection and maintenance of outdoor advertising signs" pursuant to IND.CODE § 8–23–20–25, which mandates that the department's administrative rules "be no broader than necessary to implement" the applicable federal regulations.

Both the Bodkin and Shelby signs were erected before 1968 and within 660 feet of the right-of-way line of Interstate 70. Under IND.CODE § 8–23–20–25(d), both signs were required to comply with INDOT's registration system and were subject to the department's permit regulations, which will be discussed in greater detail below. Sometime during 1994, U.S. Outdoor reconstructed both signs and installed new "faces" on the supporting structures. The methods and extent of this reconstruction, including a possible change in the size of the sign faces themselves, are vigorously disputed by the parties; as will be discussed below, however, we may not and need not attempt to unravel this Gordian knot before resolving the issues presented in this appeal.

On August 19, 1994, INDOT's right-of-way permit coordinator Deborah K. Hommel ("Hommel") sent two letters to U.S. Outdoor (by then working in partnership with ABC Partners), indicating that the Bodkin sign was ineligible for a permit "under applicable State and Federal Law" because it was "an existing non-conforming sign that ha[d] been replaced with a new sign structure," and that the Shelby sign was ineligible for a permit because it was "an existing non-conforming sign that ha[d] been reconstructed." Hommel further advised U.S. Outdoor that "[a] non-conforming sign is not allowed to be changed in any way other than its message." On September 20, 1994, INDOT received two letters dated September 13, 1994, from U.S. Outdoor's president and owner Leonard Busby ("Busby") appealing the denial of the permit applications.[2]

---

1. The Bodkin sign (registration # R03293) is located on the north side of Interstate 70 between mile markers 99 and 100; the Shelby sign (registration # R03296) is located on the south side of Interstate 70 between mile markers 95 and 96.

2. On October 25, 1994, U.S. Outdoor submitted registration/permit application forms for the

Bodkin and Shelby signs; these forms reflect changes to the size of the sign faces and the substructure of both signs and perhaps the addition of illumination to both signs since the original applications were filed by I–69 on December 22, 1993. The record also contains incomplete registration/permit application forms for both signs that were filled out by ABC Partners and

The parties appeared at a hearing before an administrative law judge ("ALJ") on December 5 and 6, 1995. On May 2, 1996, the ALJ issued his proposed findings and recommended order, which recommended that INDOT affirm the denial of U.S. Outdoor's permit applications. With respect to the Shelby sign, the ALJ made the following findings and conclusions:

1. The sign was originally erected prior to 1968.

2. The sign was located within a control area and a permit was required.

3. The location of the sign was zoned residential.

4. A new sign was constructed at the location of the old sign and such used a torsion bar design.

5. The original design connected the poles directly to the sign face and did not use a torsion bar.

6. The new sign was ineligible for a permit under [IND. ADMIN. CODE 105, 7–3–6] because the area was not a zoned or unzoned commercial or industrial area. . . .

Parties stipulated that the original sign was erected prior to 1968 and there was no dispute that it was located within a control area. Ample evidence was presented that the area was not zoned commercial or industrial and was zoned residential and thus pursuant to [IND. ADMIN. CODE 105, 7–3–6] an existing sign is not eligible for a "legal" or unconditional permit. . . . Similarly, a new sign would not be eligible for a permit at this location due to improper zoning.

U.S. Outdoor argues that pursuant to the direction of INDOT employees this sign was repaired. Further, both [Busby and U.S. Outdoor field superintendent Steve Gibson ("Gibson")] testified that material taken from the original sign, i.e. metal poles and stringers, were reused to rebuild the sign. Testimony of INDOT Inspector, Doris Harris, was that the sign had been completely reconstructed.

Respondent's [Exhibit R], in my view provides irrefutable visual evidence that a second sign was built in front of the old sign. This photograph, taken by Ms. Harris on 6/28/94, clearly shows the old sign, which was depicted prior to the second sign being built in [Respondent's Exhibit C], still standing and directly behind the

---

signed and notarized on December 29, 1994. On February 27, 1995, ABC Partners (in care of U.S. Outdoor) completed but failed to notarize registration/permit application forms for both signs that reflected almost exactly the same changes to their size, substructure, and illumination that were contained in the forms dated October 25, 1994. On April 11 and 12, 1995, Dawn D. Barr, Right–of–Way Coordinator at INDOT, sent letters to ABC Partners regarding the Bodkin and Shelby signs respectively, stating that the permit applications had been denied because the "sign[s] [were] completely rebuilt in the summer of 1994." The letters also noted that "[n]on-conforming signs cannot be altered in size, nor can the repairs/maintenance exceed 50% of the total structure[.]" (For the sake of completeness, we note that U.S. Outdoor's appeal arose from INDOT's original letters of denial dated August 19, 1994; that INDOT subsequently notified U.S. Outdoor that a so-called "50% rule" had not been adopted and had not formed the basis of INDOT's decision to deny the permits; and that the ALJ did not rely upon the "50% rule" in its decision to affirm the permit denials.) With respect to the Bodkin sign, Barr made this additional statement:

> Prior to this date the sign had a non-conforming status because it was originally erected prior to 1968 beyond 660' [feet] of the right-of-

way. After June 30, 1976 the Federal law states that no permit be granted for signs erected beyond 660' [feet] of the right-of-way, so your sign was grandfathered in with a nonconforming status.

At the administrative hearing, Busby testified that both signs are located more than 660 feet from Interstate 70. However, the various registration/permit application forms for the signs are inconsistent on this point; it is interesting to note that the applications filed before 1995 stated that both signs were within 660 feet of the interstate right-of-way, whereas the applications filed in 1995 (which, incidentally, were not notarized) stated that both signs were more than 660 feet from the right-of-way. The ALJ did not make a specific finding on the distance of the signs from the right-of-way, but did note that the parties did not dispute that the signs were located "within a control area," which evidently refers to IND. ADMIN CODE 105, 7–3–5 and the territory to which Article 7 of the Administrative Code applies; because of his discussion of the applicability of zoning regulations, however, it is clear that the ALJ implicitly found that both signs were located within 660 feet of the right-of-way of Interstate 70. See IND. ADMIN CODE 105, 7–3–6(1). In short, the evidence regarding the distance of the signs from the interstate right-of-way is conflicting, but we cannot find that the ALJ's determination is not supported by substantial evidence.

newly constructed sign. The testimony of Ms. Harris coupled with the photographic evidence showing the two signs existing simultaneously is compelling evidence that the sign currently in existence is a new structure and as noted earlier would be ineligible for a permit.[3]

Even assuming arguendo, that the current sign is a mere reconstruction of the previous sign, it would still be ineligible for a permit. It is undisputed that the current sign utilizes a "torsion bar" design. Specifically, the poles connect to the torsion bar and the torsion bar holds the sign face in place. It is also undisputed that the previous sign utilized many poles and connected them directly to the sign face. [IND. ADMIN. CODE 105, 7–3–7(1) ] specifies that the "sign must remain substantially the same" as it was when it became nonconforming. Whether it is called a new sign or a reconstructed sign, the design is entirely different and clearly it has not remained the same as the original sign.

Regarding the Bodkin sign, the ALJ made the following findings and conclusions:

1. The sign was originally erected prior to 1968.

2. The sign was located within a control area and a permit was required.

3. The location of the sign was zoned residential.

4. The sign underwent renovation during 1994.

5. The height of the sign was changed from 18 to 25 feet.

6. The width of the sign face was increased from 36 to 60 feet.

7. The height of the sign face was increased [from] 12 to 20 feet.

8. The overall size of the sign face was increased from 432 to 1200 square feet.

9. The number of supports was changed from 10 to 5.

10. The design of the sign was modified from one where the pole connected directly to the sign face to a torsion bar design.

11. The changes in size and design preclude a determination that the sign had remained "substantially the same" within the meaning of [IND. ADMIN. CODE 105, 7–3–7(1) ].

12. The subject structure has not remained substantially the same and is not eligible for a permit under [IND. ADMIN. CODE 105, 7–3–7(1) ] . . . .

It was stipulated that the original sign was erected prior to 1968 and there was no dispute that the sign was located within a control area and thus required a permit. It was shown that the area was zoned R–1 or residential[ ] . . . .

The testimony of [Busby and Gibson] was that the sign was repaired using original materials which were reconditioned and reconfigured to carry out the repair. INDOT witness, Duane Myers, Permits Engineer disputed the testimony in several respects particularly as it relates to whether the poles used were from the original construction. It is unnecessary to resolve the conflicts in the testimony due to evidence relating to changes in the physical size of the sign . . . .

A comparison of the applications indicates that the height of the sign changed from 18 to 25 feet, the width of the sign face changed from 36 to 60 feet, the height of the face changed from 12 to 20 feet, and the overall size of the face increased from 432 to 1200 square feet. Further, the number of supports changes from 10 wooden posts to 5 steel posts. Testimony indicated that the design of the sign had changed from one where the poles were directly connected to the sign face to one where a torsion bar design was used.

Clearly, any of these modifications constitute a change in the sign such that nonconforming status was lost, rendering the sign ineligible for a permit under [IND. ADMIN. CODE 105, 7–3–7].

The ALJ made the following observations regarding both signs:

Another point raised relates to the language of [IND.CODE § 8–23–20–25(f) ] which states that "a permit may not be

---

3. We are fortunate that our standard of review precludes us from reweighing evidence; the photocopies of the original photographs that are included in the record are of such poor quality as to render them entirely useless as documentary evidence.

issued for a sign in an adjacent area after January 1, 1968. . . ." Similar language is used at [IND. ADMIN. CODE 105, 7–3–6]. U.S. Outdoor argues that since the provisions directly deny approval for only those signs erected after January 1, 1968, then it follows that signs erected prior to that date must be issued a permit. This simply does not follow. To say a sign erected after a date may not be granted a permit under certain circumstances does not raise any inference that a permit must be issued to those erected prior.

Further, neither [23 U.S.C. § 131] [n]or [23 C.F.R. § 750] distinguish[es] between pre[-] and post[-]1968 signage in adjacent areas except to the extent that size and configuration are applicable only after the execution of the Federal–State agreement which was effective in [I]ndiana on 10/4/71. This exception does not apply to either of the signs at issue since the Shelby sign was replaced by a new sign and the Bodkin sign was increased to 1200[s]quare feet from 432 square feet. Thus, in any event, the signs are inconsistent with the provisions of [23 U.S.C. § 131] and [23 C.F.R. § 750] which forms an independent basis for denial under [IND. ADMIN. CODE 105, 7–3–12(5) ].

On September 5, 1996, INDOT Commissioner Stan C. Smith accepted the ALJ's findings and order and affirmed the decision to deny the permits; he also directed that the signs were to be removed within 30 days of the receipt of his final order. On October 24, 1996, U.S. Outdoor filed a petition for judicial review of INDOT's decision and a verified petition requesting a stay of enforcement of INDOT's order to remove the signs; the latter petition was granted by the trial court on October 8, 1996. After a hearing on December 11, 1997, the trial court affirmed INDOT's denial of the permits on February 25, 1998. U.S. Outdoor now appeals.

### Discussion and Decision
#### Standard of Review

■■■ Our review of INDOT's decision is "limited to a determination of whether the agency lacked subject matter jurisdiction or employed improper procedures, or whether the decision was unsupported by substantial evidence or was arbitrary, capricious, or in violation of constitutional, statutory or legal principles." *Brennan v. Board of Zoning Appeals of Evansville and Vanderburgh County*, 695 N.E.2d 983, 985 (Ind.Ct.App. 1998). We must review the record in the light most favorable to the administrative proceeding. *Id.* Furthermore, we are "prohibited from reweighing the evidence and judging the credibility of witnesses and must accept the facts as found by the administrative body." *Shoot v. State, Family and Social Services Admin.*, 691 N.E.2d 1290, 1292 (Ind.Ct.App.1998). In reviewing the decision of an administrative agency, this Court stands in the same position as the trial court.[4] *Brennan*, 695 N.E.2d at 985. We may vacate INDOT's decision "only if the evidence, when viewed as a whole, demonstrates that the conclusions" it reached are clearly erroneous. *Id.* As the party asserting the invalidity of INDOT's action, U.S. Outdoor "bears the burden of establishing its invalidity." *Id.*

■■■ We must accord some weight to INDOT's interpretation of statutes and regulations that it is charged with enforcing; however, we bear the ultimate responsibility of construing statutes and are not bound by INDOT's interpretation. *Id.* at 985–986. Finally, we observe that "an administrative decision may not be based *solely* upon hearsay evidence." *Ram Broadcasting of Indiana, Inc. v. MCI Airsignal of Indiana, Inc.*, 484 N.E.2d 26, 34 (Ind.Ct.App.1985) (emphasis supplied). *See* IND.CODE § 4–21.5–3–26 (an ALJ "may admit hearsay evidence. If not objected to, the hearsay evidence may form the basis for an order. However, if the evidence is properly objected to and does not fall within a recognized exception to the hearsay rule, the resulting order may not be based solely upon the hearsay evidence.").

### I. INDOT's Denial of Permit Applications for Shelby and Bodkin Signs

U.S. Outdoor argues that the ALJ misinterpreted and misapplied the relevant stat-

---

4. Although we recognize that this Court must "stand in the shoes of the trial court" in reviewing INDOT's decision, we nevertheless commend Judge Price for drafting particularly insightful and cogent findings of fact and conclusions of law in this case.

utes and regulations when he denied its applications for sign permits. U.S. Outdoor claims that the Shelby and Bodkin signs were both constructed before 1968, and that its maintenance and repair of the signs in 1994 should not have precluded INDOT from issuing permits for them. The statutes and regulations relevant to our review govern the size and informational content of outdoor advertising signs; their distance from the interstate right-of-way; the date of their construction; the extent to which so-called "nonconforming" signs may be repaired and maintained; and the zoning designation of the property on which the signs are located.

In establishing roadside areas to be governed by the applicable sign regulations, IND. CODE § 8–23–1–9 defines an "adjacent area" as "an area that is adjacent to and within six hundred sixty (660) feet of the nearest edge of the right-of-way of an interstate or primary highway." This 660–foot line of demarcation figures prominently in related statutes and regulations pertaining to outdoor advertising signs.

IND.CODE § 8–23–20–6 contains the following language regarding "prohibited signs" for adjacent areas:

Sec. 6. The following signs may not be erected or maintained in an adjacent area:

(1) Signs that are illegal under state statutes or rules....

(5) Signs that are not consistent with this chapter.

IND.CODE § 8–23–20–25 is a comprehensive statute that enables INDOT to institute a permit and registration system to regulate outdoor advertising signs:

Sec. 25. (a) The department shall institute a permit system to regulate the erection and maintenance of outdoor advertising signs along:

(1) the interstate and primary system, as defined in [23 U.S.C. § 131(t) ] on June 1, 1991; and

(2) any other highways where control of outdoor advertising signs is required under [23 U.S.C. § 131].

(b) Except as provided in subsections (c) and (g), a sign may not be erected, operated, used, or maintained in areas described

in subsection (a) unless the owner of the sign has obtained a permit under this section.

(c) A permit is not required to erect, operate, use, or maintain the following signs:

(1) Directional or official signs and notices.

(2) Signs advertising the sale or lease of the property on which the sign is located.

(3) Signs that primarily indicate:

(A) the name of the business, activity, or profession conducted;

(B) the types of goods produced or sold; or

(C) the services rendered;

on the property on which the sign is located.

(d) Signs in existence on July 1, 1993, and subject to this section:

(1) must comply with the registration system described in subsection (h); and

(2) are subject to the permit requirement after the department has made the determination described in subsection (g).

(e) The department shall adopt rules under [IND.CODE § 4–22–2] to carry out this section. Rules adopted under this section may be no broader than necessary to implement [23 U.S.C. § 131] and [23 C.F.R § 750].

(f) In addition to the requirements of subsection (e), rules adopted under this section must provide the following:

(1) A list of all roadways subject to the permit requirement.

(2) A procedure to appeal adverse determinations of the department under [IND.CODE § 4–21.5], including provisions for judicial review under [IND.CODE § 4–21.5]....

(4) That a permit may not be issued for a sign erected in an adjacent area after January 1, 1968, unless:

(A) the sign is erected in an area described in section 5 of this chapter; or

(B) the permit is a conditional permit issued under subdivision (6).

(5) That a permit may not be issued for a sign erected after June 30, 1976, outside of urban areas,[5] beyond six hundred sixty (660) feet of the right-of-way, visible from the traveled way, and erected with the purpose of a message being read from the traveled way, unless:

(A) the sign is erected in an area described in section 5 of this chapter; or

(B) the permit is a conditional permit issued under subdivision (6).

(6) For the issuance of a conditional permit for a nonconforming sign that has not been acquired under section 10 of this chapter. A conditional permit issued under this subdivision may be revoked if the department subsequently acquires the sign....

(9) Any other provisions necessary to:

(A) administer this section; or

(B) avoid sanctions under [23 U.S.C. § 131].

(g) A sign that is subject to and complies with the registration system described in subsection (h) may not be declared unlawful until the later of the following:

(1) The department has made a determination of permit eligibility under this section.

(2) December 31, 1993.

(h) A separate application for registration must be submitted to the department for each structure defined in subsection (d) and must:

(1) be on a form furnished by the department;

(2) signed by the applicant or an individual authorized in writing to sign for the applicant;

(3) provide information concerning the size, shape, and nature of the advertising sign, display, or device;

(4) provide the sign's actual location with sufficient accuracy to enable the department to locate the sign; and

(5) include a one-time registration fee of twenty-five dollars ($25).

(i) A sign that is not registered before January 1, 1994, is a public nuisance subject to section 26 of this chapter....

IND. ADMIN. CODE 105, 7–3–6 sets forth INDOT's criteria for permit denial:

Sec. 6. No permit, except as provided in section 7 of this rule, may be issued for any sign structure:

(1) Within six hundred sixty (660) feet of the right-of-way of a roadway, erected after January 1, 1968, except in zoned or unzoned commercial or industrial areas.[6]

(2) Beyond six hundred sixty (660) feet of the right-of-way, outside of urban areas, visible from the right-of-way, and erected with the purpose of a message being read from the traveled portion, and erected after June 30, 1976....[7]

5. IND CODE § 8–23–1–44 defines an "urban area" as
(1) an urbanized area designated by the Bureau of the Census;
(2) if an urbanized area lies within more than one (1) state, the part of the area that lies within the boundaries of Indiana; or
(3) an urban place designated by the Bureau of the Census having a population of at least five thousand (5,000) that is not within an urbanized area and is within boundaries cooperatively established by the department and local officials.

6. IND.CODE § 8–23–1–43(a) reads as follows:
Sec. 43. (a) "Unzoned commercial or industrial area" means an adjacent area not zoned under state or local statute, rule, or ordinance on which there is located one (1) or more permanent structures for commercial or industrial activities other than a sign or upon

which a commercial or an industrial activity is actually conducted, whether or not there is a permanent structure located upon the adjacent area, and the area:
(1) extending six hundred (600) feet beyond the edge of the commercial or industrial activity as determined under subsection (c); and
(2) located along either side of an interstate or a primary highway.
The term does not include land contiguous to an interstate or a primary highway that has been designated as scenic by the state.

7. IND.CODE § 8–23–20–7 pertains to signs that may be erected beyond an adjacent area:
Sec. 7 The following signs may be erected outside of urban areas beyond six hundred and sixty (660) feet of the right-of-way visible from the traveled way of a highway on the interstate

IND. ADMIN. CODE 105, 7–3–12 serves as a catch-all regulation for permit denials:

Sec. 12. The following signs shall not be eligible for a permit:

(1) Signs which are illegal under state laws or rules....

(5) Signs otherwise inconsistent with:

(A) [23 U.S.C. § 131], as effective December 18, 1991;

(B) [23 C.F.R. § 750];

(C) [IND.CODE § 8–23–20]; or

(D) this rule.

U.S. Outdoor points out that neither the Billboard Act nor IND. ADMIN. CODE 105, 7–3–6 specifically contains a provision to deny permits for signs erected *before* January 1, 1968. Rather than attempt to discern the legislature's intent with respect to granting or denying permits for signs erected before 1968, however, we need only focus on the language of IND. ADMIN. CODE 105, 7–3–7 regarding conditional permits for nonconforming signs.[8]

Our review of this issue has been greatly simplified because of U.S. Outdoor's admission that the Bodkin and Shelby signs were legal nonconforming signs. In his decision, the ALJ noted that both parties had stipulated that the signs were erected "prior to 1968 and [that] there was no dispute that [they were] located within a control area" and therefore required permits; U.S. Outdoor does not dispute this finding on appeal, and we can discover no evidence that indicates this finding is clearly erroneous. On September 13, 1994, Busby drafted two let-

ters to a "Ms. Hammel"[9] at INDOT to request an appeal from the permit denials. With respect to the Bodkin sign, Busby wrote,

This non-conforming sign has been in existence for approximately 25 years. Due to the deteriorating state of this legal nonconforming sign, U.S. Outdoor Advertising Company has reconditioned this sign to look like new. In respect to [IND. ADMIN. CODE 105, 7–3–7(1)] "The sign must remain substantially the same [as] it was on the date that its status initially became non-conforming [*sic*]. Reasonable maintenance and repair shall not be considered to have substantially altered the sign.", which grants anyone permission to perform the "reasonable maintenance and repairs". This non-conforming sign is now not a hazard nor an eye sore for the community or traveling public.

In reference to the Shelby sign, Busby made the following comments:

In accord with [IND. ADMIN. CODE 105, 7–3–7(1)] "The sign must remain substantially the same [as] it was on the date that its status initially became non-conforming [*sic*]. Reasonable maintenance and repair shall *not* be considered to have substantially altered the sign.", we are allowed to provide to upkeep [ ] or restore to sound condition this non-conforming sign. Due to the effects of mother nature, the non-conforming sign was in need of critical and extreme work in order to make the sign structure sound. In consideration for the safety of the landowner and their property,

---

or primary system with the intent of a message being read from the traveled way:

(1) Directional or official signs and notices.
(2) Signs advertising the sale or lease of the property upon which the signs are located.
(3) Signs indicating the name of the business, activities, or profession conducted on the property, or identifying the goods produced or sold, or services rendered on the property.

**8.** Common sense leads us to believe that relatively few billboards erected before 1968 remain standing along Indiana's interstate highways; nevertheless, in the interest of preventing future confusion on this issue and avoiding unnecessary forays into statutory interpretation, we strongly encourage both the General Assembly and IN-

DOT to review the Billboard Act and its associated regulations and resolve the questions of whether and how pre–1968 advertising signs should be regulated under the registration and permit system. We note that IND.CODE § 8–23–20–25(d) requires that "[s]igns in existence on July 1, 1993 and subject to this section: (1) must comply with the registration system described in subsection (h)."

**9.** Busby certainly refers to INDOT employee Deborah K. Hommel mentioned above, who signed the letters denying permits for the Bodkin and Shelby signs. Although Busby's letters were not introduced into evidence at the hearing by either of the parties, U.S. Outdoor acknowledged that the ALJ took notice of the letters as part of the official record.

as well as the public traveling in, around, or near our structure, reasonable maintenance and repairs were made. [Emphasis in original.]

IND. ADMIN. CODE 105, 7–3–7 provides for the issuance of conditional permits:

Sec. 7. A conditional permit shall be granted to any sign lawfully erected that is not eligible for a permit under section 6 of this rule, provided the following:

(1) The sign must remain substantially the same as it was on the date that its status initially became nonconforming. Reasonable maintenance and repair shall not be considered to have substantially altered the sign.

(2) The sign has not been destroyed, abandoned, or discontinued. If reerected in kind, signs destroyed due to vandalism, criminal acts, or tortious acts shall not be considered destroyed.

Under IND.CODE § 8–23–1–21, " 'Erect' means to construct, build, raise, assemble, place, affix, attach, create, paint, draw, or in any way bring into being or establish. The term does not include an activity performed as an incident to the change of an advertising message or normal maintenance or repair of a sign structure." According to IND.CODE § 8–23–1–29, " 'Maintain' means allow to exist.' " U.S. Outdoor argues that the ALJ was "overly aggressive" in his interpretation of the statutory and regulatory guidelines for maintaining and repairing an existing sign, and that his factual findings and legal conclusions are unsupported by either the evidence or the law. Even if we were permitted to construe the evidence regarding U.S. Outdoor's work on the signs in their favor—in other words, even if we could reweigh the evidence and take the testimony of Busby and U.S. Outdoor field superintendent Gibson at face value—we would still agree with the ALJ that the resulting alterations to the signs were substantial enough to render them ineligible to receive conditional permits as legal nonconforming signs.

To briefly summarize Gibson's testimony, both signs were originally constructed with wood and steel substructures. On the Bodkin sign, Gibson's work crew left one of the vertical steel support poles in its original location and moved four of the other vertical steel poles in front of the original sign and set them in concrete-filled holes eight feet deep. They then attached another steel support pole from the original structure horizontally across the top of the five vertical support poles to act as a torsion bar—a structural reinforcement feature that was not utilized in the original sign. The steel poles were also primed and painted to resist rust. Gibson's crew then attached approximately four new steel I-beam "uprights" to the torsion bar and used metal "stringers" from the original sign to attach the new 20–foot–by–60–foot metal sign face to its supporting structure; they also replaced existing light fixtures with new light fixtures that are less expensive to maintain. Finally, Gibson discarded the original wooden sign face and wooden structural members because they had rotted.

On the Shelby sign, Gibson's crew moved five of the original vertical steel support poles. forward approximately two feet and installed another original steel pole across the top of them to act as a torsion bar; as with the Bodkin sign, the poles were primed and painted to resist rust and were stabilized at the base with concrete. During the work on the steel framing, the original wooden sign was left attached to the remaining wooden support structure. The Shelby sign was then reconstructed in a manner essentially similar to that of the Bodkin sign, including the installation of a new 20–foot–by–60–foot metal sign face and new lighting fixtures to replace the existing fixtures on the old wooden sign.

The cases on which U.S. Outdoor relies to support its argument that its maintenance and repair of the signs was reasonable are inapposite to the instant dispute. We need not consider the venerable Indiana cases cited for our consideration, both of which apply to fences and significantly predate the applicable statutory definition of "maintain" at IND.CODE § 8–23–1–29. *Gannett Outdoor of Chicago v. Baise,* 163 Ill.App.3d 717, 114 Ill.Dec. 760, 516 N.E.2d 915 (1987) focuses on the trial court's abuse of discretion in refusing to grant the plaintiff a preliminary injunction, not on the determination of whether

a sign was maintained or newly erected. U.S. Outdoor's cornerstone case, *Department of Transportation v. Keller Development Corporation*, 122 Ill.App.3d 1038, 78 Ill.Dec. 413, 462 N.E.2d 532 (1984), involved a sign that was heavily damaged by a windstorm and subsequently replaced with completely new materials. Unlike INDOT, the Illinois Department of Transportation had officially adopted a regulation that provided in relevant part " 'when more than 50 percent of the uprights require replacement in whole or in part the sign may not be re-erected without a valid permit. . . .' "; more critically, the Illinois Court of Appeals found that by adopting this regulation, the Illinois Department of Transportation had "in effect usurped the power of the General Assembly by adding a substantive provision to the [Highway Advertising Control] Act which greatly increases the severity of the Act." *Id.*, 122 Ill.App.3d at 1041, 78 Ill.Dec. 413, 462 N.E.2d at 535. We find no such usurpation of the power of the Indiana General Assembly by INDOT in the case at bar.[10] Finally, *Rothrock v. Zoning Hearing Board of Whitehall Township*, 13 Pa.Cmwlth. 440, 442, 319 A.2d 432, 433 (1974) involved the interpretation of local zoning regulations, which were "silent on the question of whether a nonconforming sign may be replaced or restored"; the Billboard Act and IND. ADMIN. CODE 105 provide both INDOT and this Court with sufficient guidance to answer this question in the instant case.

 In an appeal involving an agency's determination of a question of law, we are not bound by the agency's interpretation of the law, but rather determine "whether the agency correctly interpreted and applied the law." *Miller Brewing Co. v. Bartholemew Beverage Co., Inc.*, 674 N.E.2d 193, 200 (Ind.Ct.App.1996), *trans. denied* (1997). However, when a statute is clear and unambiguous on its face, we need not, "and indeed must not interpret the statute." *Indiana Dept. of Natural Resources v. Peabody Coal Co.*, 654 N.E.2d 289, 295 (Ind.Ct.App.1995).

"A statute is ambiguous, and thus open to judicial construction, when it is susceptible to more than one interpretation." *Id.*

> When interpreting a statute, the foremost objective is to determine and effect legislative intent[.] [11] Statutes must be construed to give effect to legislative intent, and courts must give deference to such intent whenever possible[.] Thus, courts must consider the goals of the statute and the reasons and policy underlying the statute's enactment[.] Courts are to examine and interpret the statute as a whole, giving words their common and ordinary meaning, and not overemphasize a strict, literal, or selective reading of individual words[.] Words and phrases are taken in their plain, ordinary, and usual meaning unless a different purpose is manifested by the statute[.] Where possible, every word must be given effect and meaning, and no part is to be held meaningless if it can be reconciled with the rest of the statute[.]

*JKB, Sr. v. Armour Pharmaceutical Co.*, 660 N.E.2d 602, 605 (Ind.Ct.App.1996), *trans. denied.* Finally, the "rules of statutory construction are also applicable to the interpretation of administrative regulations," and "[w]hen a regulation is susceptible to more than one interpretation, we may consider the consequences of a particular interpretation." *Bryant v. Indiana State Dept. of Health*, 695 N.E.2d 975, 978 (Ind.Ct.App.1998).

 "Generally, administrative decisions must be based upon ascertainable standards to ensure that agency action will be orderly and consistent." *Midwest Steel Erection Co., Inc. v. Commissioner of Labor*, 482 N.E.2d 1369, 1371 (Ind.Ct.App.1985), *trans. denied* (1986). "The standards should be stated with sufficient precision to provide those having contact with the agency fair warning of the criteria by which they will be judged." *Id.* The test we apply in determining whether a standard can survive a challenge for vagueness is whether it is so indefinite that persons "of common intelligence

---

**10.** On a related note, IND. ADMIN. CODE 105, 7–3–7(2) provides that signs "destroyed due to vandalism, criminal acts, or tortious acts shall not be considered destroyed" and may be "reerected in kind."

**11.** Omitted citations will hereinafter be indicated by "[.]" for purposes of legibility.

must necessarily guess at its meaning and differ as to its application." *Id.*

U.S. Outdoor adamantly contends that the Billboard Act "was not simply adopted to require the removal of billboards or to increase the beauty of Indiana's highways." Without referring to any authority other than dicta contained in the ALJ's findings, U.S. Outdoor argues that the General Assembly passed the Billboard Act to protect federal highway funding and did not intend to regulate signs constructed before 1968. *See* IND.CODE § 8–23–20–1(a) (INDOT's agreements with United States Secretary of Commerce "must conform to the provisions of 23 U.S.C. to ensure that federal funds to Indiana are continued.").

Although we acknowledge that IND.CODE § 8–23–20–25(e) cautions INDOT that the rules it adopts to enforce the Billboard Act "may be no broader than necessary to implement [23 U.S.C. § 131] and [23 C.F.R. § 750]," we note that the U.S. Congress

> [found] and [declared] that the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to the Interstate System and the primary system should be controlled in order to protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty.[12]

23 U.S.C. § 131(a). Similarly, the U.S. Supreme Court has stated that it "hesitate[s] to disagree with the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety," and that "[i]t is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.'" *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 509–510, 101 S.Ct. 2882, 2893–2894, 69 L.Ed.2d 800, 816 (1981).

U.S. Outdoor attempts to base its interpretation of "reasonable maintenance and re-

pair" of the signs on the disproportionate relationship between the cost of the work it performed on the signs (approximately $5,000 per sign) and their fair market value (approximately $90,000 per sign) and potential revenue over the term of a five-year advertising lease (between $60,000 and $120,000 per sign). We view as ultimately misguided U.S. Outdoor's reliance on economic factors (including tax revenues generated by sales at its client's gas stations) to support its argument. The fact remains that U.S. Outdoor substantially altered the signs in violation of the letter and the purpose of the Billboard Act; the cost of the alterations is of no consequence in arriving at this conclusion.

The purpose of the state and federal Billboard Acts, as reflected in the Supreme Court's holding in *Metromedia,* is obviously to "promote the safety and recreational value of public travel, and to preserve natural beauty." 23 U.S.C. § 131(a). This is to be accomplished by regulating the placement and content of new outdoor advertising signs and allowing state governments (with federal assistance) to pay just compensation for the removal of existing signs that do not conform to the dictates of the federal Billboard Act. *See, e.g.,* 23 U.S.C. § 131(n); IND.CODE § 8–23–20–10. States may establish standards "imposing stricter limitations with respect to signs, displays, and devices on the Federal-aid highway systems than those established under" the federal Billboard Act. 23 U.S.C. § 131(k). Legal nonconforming signs that are not purchased by the government but are otherwise eligible for conditional permits may be maintained and repaired, but cannot be "substantially altered" or reerected if destroyed by forces of nature. *See* IND. ADMIN. CODE 105, 7–3–7(1), (2) (signs may be reerected in kind if destroyed "due to vandalism, criminal acts, or tortious acts"; no such provision is included for signs destroyed by acts of nature).

Clearly, the legislature's intent as expressed in the Billboard Act is to compensate

---

**12.** Busby's letter of appeal to Hommel regarding the Bodkin sign reflects a curious interpretation of the Billboard Act: "This non-conforming sign is now not a hazard nor an eye sore [*sic*] for the community or traveling public." Congress would undoubtedly be surprised to discover that billboards are objects of "natural beauty" that fall within the protective ambit of 23 U.S.C. § 131.

as many sign owners as state and federal funding will allow for the removal of their legal nonconforming signs; those who wish to maintain their signs must follow INDOT's permit guidelines, while recognizing that their billboards must eventually share the same fate as the fabled Colossus at Rhodes and surrender to the implacable destructive efforts of age and nature. Were we to interpret the Billboard Act otherwise, its location restrictions for new signs would be continually thwarted by sign owners who would attempt to substantially alter and rehabilitate their existing signs to last indefinitely, thereby creating perpetual safety hazards and public eyesores. *See Appalachian Poster Advertising Co., Inc. v. Harrington,* 120 N.C.App. 72, 79, 460 S.E.2d 887, 891 (1995) (Lewis, J., dissenting), *dissent adopted on appeal by* 343 N.C. 303, 469 S.E.2d 554 (1996):

> It is absurd to conclude that the Legislature intended to permit advertisers to circumvent the purposes of the Outdoor Advertising Control Act by converting old, nonconforming signs into new signs thereby avoiding regulation of these "new" signs. This would allow the unending converting of all existing nonconforming signs into "new" signs.

 With the above considerations in mind, we cannot find that IND. ADMIN. CODE 105, 7–3–7(1) is so vague and indefinite that it provides insufficient guidance to outdoor advertising sign owners who wish to repair or maintain their legal nonconforming signs and comply with the relevant permit requirements.[13] Clearly, U.S. Outdoor performed more than routine maintenance or repair work on both signs; rather than simply "allow[ing the signs] to exist" under IND.CODE § 8–23–1–29, Gibson and his crew took down all the steel uprights of the Shelby sign (and

all but one from the Bodkin sign); either primed, painted, and reused the original steel uprights or installed new steel uprights in newly excavated holes filled with concrete; fastened a steel torsion bar to the uprights of each sign; installed new sign faces and lighting on each sign; and discarded the original wooden support structures and faces.

We need not seek out or develop complex technical formulae in this case (or in any case) to determine whether a sign owner has failed to comply with the dictates of IND. ADMIN. CODE 105, 7–3–7(1), nor should we require INDOT to draft regulations to anticipate every conceivable method of repairing or maintaining a sign. Each case is necessarily fact-sensitive, and the fact that a sign owner may have reused some original material in the course of reasonably maintaining an existing sign should not be the single dispositive factor in determining whether a sign has been substantially altered. Similarly, a simple change of sign facing should not be considered a *sine qua non* in an INDOT permit investigation, as long as the sign's dimensions and content conform to the guidelines of the Billboard Act; the same may be said for a sign's illumination.[14] Rather than censure INDOT permit engineer Duane Myers for his case-by-case approach to inspecting outdoor advertising signs, we applaud this sensible method and believe it to be fair and helpful to both the department and sign owners who wish to maintain their signs in conformity with the Billboard Act.

In the instant case, U.S. Outdoor obviously extended its work on the signs beyond the scope of "[r]easonable maintenance and repair" under IND. ADMIN. CODE 105, 7–3–7(1) and erected substantially new (and structurally improved) signs on the Shelby and Bod-

---

**13.** It is important to remember that the ALJ found that a new sign had been erected at the location of the original Shelby sign and determined that the "new sign was ineligible for a permit under [IND. ADMIN. CODE 105, 7–3–6] because the area was not a zoned or unzoned commercial or industrial area." However, as mentioned above, the ALJ also concluded that even if the "current sign is a mere reconstruction of the previous sign," it would still be ineligible for a permit under IND. ADMIN. CODE 105, 7–3–

7(1). We are convinced that the ALJ's conclusions are correct in either case, and there is no reason to contradict his finding that a new sign had been constructed. In any event, we are nevertheless compelled to remand this cause to the department to conclusively determine the zoning designations of both the Shelby and Bodkin properties.

**14.** *See, e.g.,* IND. ADMIN. CODE 105, 7–3–9, –11, –12.

kin properties.[15] Although we recognize that IND. ADMIN. CODE 105, 7–3–7(1) is (and of necessity must be) broadly drafted, we are confident that sign owners and INDOT officials who are familiar with the letter and the spirit of the state and federal Billboard Acts cannot guess at its meaning or differ significantly as to its application. *See Midwest Steel Erection*, 482 N.E.2d at 1371.

■ What remains to be determined, however, is whether the reconstructed Bodkin and Shelby signs are currently ineligible for permits under IND. ADMIN. CODE 105, 7–3–6(1). The ALJ found that both signs were located on property that was zoned residential, but the relevant evidence adduced at the administrative hearing was properly objected to on hearsay grounds. As noted above, "an administrative decision may not be based solely upon hearsay evidence." *Ram Broadcasting*, 484 N.E.2d at 34. The ALJ's implicit determination that both signs are within 660 feet of the right-of-way of Interstate 70 is supported by sufficient competent evidence; however, the critical determination of whether the signs are located in either residential or "zoned or unzoned commercial areas" is not. Although one could argue that the ALJ's decision of permit ineligibility is not based *solely* on hearsay evidence, we refuse to engage in semantic sophistry to resolve the question. Having found that both signs are ineligible for conditional permits under IND. ADMIN. CODE 105, 7–3–7(1), we remand this cause to the department for a hearing to determine the zoning of the properties on which the signs are located. If the properties are found to be zoned residential, the signs would be ineligible to receive permits under IND. ADMIN. CODE 105, 7–3–6(1) and should be removed in accordance with the relevant provisions of the Billboard Act.[16]

## II. Equitable Estoppel

■ U.S. Outdoor argues that INDOT should be equitably estopped from denying its applications for sign permits, referring to a conversation Busby had in 1993 with INDOT employee Hommel in which she reportedly told him that he could repair the signs as long as he did not increase their size.[17] The ALJ found that Busby's "account of the conversation was too vague to form the basis of reasonable reliance to consider the application of the equitable estoppel doctrine." We agree.

■ As the party claiming equitable estoppel, U.S. Outdoor must show its " '(1) lack of knowledge and of the means of knowledge as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) action based thereon of such a character as to change his position prejudicially.' " *City of Crown Point v. Lake County*, 510

15. As noted above, IND.CODE § 8–23–1–21 provides that " '[e]rect' means to construct, build, raise, assemble, place, ... or in any way bring into being or establish. The term does not include an activity performed as an incident to the change of an advertising message or normal maintenance or repair of a sign structure." We agree with the ALJ's finding that U.S. Outdoor erected a new sign on the Shelby property and substantially altered the existing Bodkin sign beyond changing its advertising message or performing normal maintenance or repair. In light of the factual situation in the instant case, we consider it prudent to advise outdoor advertising sign owners who are interested in maintaining or repairing their signs to contact appropriate officials at INDOT before performing any work; to inform them in detail of the proposed changes; and to request (and/or draft) a detailed written memorialization of their conversation(s).

16. The dissent contends that because "U.S. Outdoor's substantial alteration of its billboards destroys their status as non-conforming signs,"

"the signs would not fall under any category that would allow them to obtain permits under Indiana law." We respectfully observe, however, that IND ADMIN CODE 105, 7–3–6(1) states that no permit may be issued for a sign "[w]ithin six hundred sixty (660) feet of the right-of-way of a roadway, erected after January 1, 1968, except in *zoned or unzoned commercial or industrial areas*." (Emphasis supplied.) The evidence upon which the ALJ relied to find that the Bodkin and Shelby properties are zoned residential is hearsay; because the signs *may* be eligible for permits if the properties are found to be "zoned or unzoned commercial or industrial areas," we are convinced that zoning is such an essential factor in determining permit eligibility that we must remand this case to INDOT for a hearing instead of affirming the ALJ's decision, even though it was not based *solely* on hearsay.

17. In its findings, the trial court also mentions Busby's reference to a conversation he had with an unidentified INDOT employee referred to as "Mr. Mann."

N.E.2d 684, 687 (Ind.1987), quoting *Damler v. Baine*, 114 Ind.App. 534, 542–543, 51 N.E.2d 885, 889 (1943). Equitable estoppel cannot ordinarily be applied against government entities, although its application is not absolutely prohibited. *City of Crown Point*, 510 N.E.2d at 687. However, our courts have been "hesitant to allow an estoppel in those cases where the party claiming to have been ignorant of the facts had access to the correct information." *Cablevision of Chicago v. Colby Cable Corp.*, 417 N.E.2d 348, 355 (Ind.Ct.App.1981). "Generally, reliance on misinformation provided by a government employee is not a basis for estoppel because the government could be precluded from functioning if it were bound by its employees' unauthorized representations." *National Salvage & Service Corp. v. Commissioner of Indiana Dept. of Environmental Management*, 571 N.E.2d 548, 556 (Ind.Ct.App.1991), *trans. denied* (1992), *cert. denied*, 506 U.S. 871, 113 S.Ct. 205, 121 L.Ed.2d 146 (1992). Moreover, courts are reluctant to apply equitable estoppel unless it is in the public interest to do so. *Id.* Finally, our supreme court has stated,

> When the legislature enacts procedures and timetables which act as a precedent to the exercise of some right or remedy, those procedures cannot be circumvented by the unauthorized acts and statements of officers, agents or staff of the various departments of our state government[.] All persons are charged with the knowledge of the rights and remedies prescribed by statute.

*Middleton Motors, Inc. v. Indiana Dept. of State Revenue, Gross Income Tax Division*, 269 Ind. 282, 285, 380 N.E.2d 79, 81 (1978).

First, we note that Busby failed to memorialize the content of his conversations with INDOT employees, nor did he request any written acknowledgments or guidelines from the department. The record does not indicate whether Busby gave INDOT any detailed information about his plans for the reconstruction of the signs in addition to changing the sign faces. Furthermore, the ALJ found that U.S. Outdoor had increased the square footage and height of the Bodkin sign face in direct contravention of INDOT's

purported instructions. As the State correctly observes, U.S. Outdoor is "engaged in the nationwide business of billboard advertising," which requires that it be familiar with the rules and regulations of the states in which they transact business. In his letters to Hommel appealing INDOT's permit denial, Busby quotes Indiana law chapter and verse but does not acknowledge any reliance on her previous statements as the basis for U.S. Outdoor's reconstruction of the signs. Finally, U.S. Outdoor fails to show how the application of equitable estoppel against INDOT would serve the public interest; we are unable to divine the relevance of its arguments regarding just compensation and regulatory policy. Consequently, we cannot find any compelling reason to reverse the ALJ's determination that the doctrine of equitable estoppel should not apply in this case.

### III. Denial of U.S. Outdoor's Due Process Rights

U.S. Outdoor argues that INDOT's denial of the permit applications violated its due process rights as follows: (1) INDOT failed to provide adequate notice of its reasons for the denial of the permits; (2) INDOT failed to provide readily ascertainable standards for its evaluation of the permit applications; and (3) the ALJ and INDOT's attorney failed to disqualify themselves from the proceedings after the attorney was appointed an ALJ for INDOT. We shall discuss these allegations of error in more detail below.

### A. Failure to provide adequate notice of reasons for denial

U.S. Outdoor asserts that not only did INDOT provide inconsistent reasons for denying its permit applications, but the ALJ listed "yet other reasons" for the denials. According to U.S. Outdoor, INDOT's initial reason for denying the permits was that the signs were "existing non-conforming sign[s] that [had] been reconstructed"; INDOT issued subsequent denials that contained the controversial (and ultimately irrelevant) 50% repair rule. As noted above, INDOT later informed U.S. Outdoor that it had not used the "50% rule" as a basis for the denial of the permits, nor did the ALJ consider the rule in

formulating his decision. With respect to the Shelby sign, the ALJ noted that "a new sign would not be eligible for a permit at this location due to improper zoning," and that even if "the current sign [were] a mere reconstruction of the previous sign, it would still be ineligible for a permit" because "the design is entirely different and clearly it has not remained the same as the original sign" in contravention of IND. ADMIN. CODE 105, 7–3–7(1). Regarding the Bodkin sign, the ALJ concluded that the design modifications "constitute[d] a change in the sign such that nonconforming status was lost, rendering the sign ineligible for a permit under [IND. ADMIN. CODE 105, 7–3–7]."

■ IND. ADMIN. CODE 105, 7–3–1(b) provides in relevant part that "[t]he denial of a permit by the department shall be accompanied by an order" that "shall include a clear statement of the rationale upon which the denial was based." This regulatory guideline echoes applicable case law precedent: "To satisfy due process, administrative decision making must be done in accordance with previously stated, ascertainable standards," which "should be written with sufficient precision in order to give fair warning as to what the agency will consider in making its decision." *Union Tank Car, Fleet Operations v. Commissioner of Labor*, 671 N.E.2d 885, 889 (Ind.Ct.App.1996), *trans. denied* (1997).

■ While it is true that the ALJ listed additional reasons for affirming INDOT's denial of the permits, we note that U.S. Outdoor did not object to litigating the zoning issue during the hearing on unfair surprise or due process grounds, but strictly on the basis of hearsay. We also find that the ALJ's decision to deny the permits sufficiently tracks the language of INDOT's original denial letters, which focused on the reconstruction or replacement of nonconforming signs. Finally, and more fundamentally, U.S. Outdoor has failed to show that it was prejudiced in any way by INDOT's notice of denial or the ALJ's decision, and we will not reverse the judgment on this issue. *See State ex rel. Mass Transp. Authority of Greater Indianapolis v. Indiana Revenue*

*Bd.*, 254 N.E.2d 1, 5 (Ind.1969) [18] (supreme court was "not inclined to hold that petitioners were denied due process merely on their claim alone, there being absolutely no showing of any resulting prejudice").

### B. Failure to provide notice of ascertainable standard for permit evaluation

■ U.S. Outdoor next argues that INDOT changed its reasons for denying permits, leaving it to guess as to INDOT's application of the "rules promulgated to govern billboards." As mentioned above, INDOT informed U.S. Outdoor before the administrative hearing that it had not used the "50% rule" as a basis for its denial, and the application of this rule was never seriously debated at the hearing. The issuance and substance of INDOT's letters referring to the "50% rule," while certainly puzzling and potentially confusing, did not actually confuse or ultimately mislead U.S. Outdoor during the course of its appeal. Nor are we troubled by INDOT permit engineer Duane Myers' comment that he looks at "a total package" when determining whether to deny a permit for a particular sign; as the State observes, no "detailed standard is likely to be able to comprehend all the situations the State must regulate" when evaluating signs under the Billboard Act.

On a more prosaic level, U.S. Outdoor's notice argument strikes us as somewhat disingenuous, given that it applied for the permits using the specifications from the old signs; reconstructed or replaced the signs in total disregard of both the letter and the spirit of the Billboard Act; and then appealed INDOT's determination that the signs had been reconstructed or replaced. As stated above, the obvious purpose of 23 U.S.C. § 131 and the Billboard Act is to allow sign owners to *maintain* nonconforming billboards in their original state as long as is practical, with the understanding that the signs will be either purchased and subsequently dismantled by the State or left to succumb to the ravages of time and nature.

---

**18.** For clarity's sake, we note that this case does not appear in Indiana Reports and therefore does not include a parallel citation to this authority.

U.S. Outdoor's reconstruction of the Shelby and Bodkin signs may be viewed as an attempt to make an end run around INDOT and the statutes and regulations the department is charged with interpreting and enforcing.

### C. Appointment of INDOT attorney as ALJ

■ U.S. Outdoor claims that it was not provided with "a neutral and unbiased decisionmaker" because INDOT's attorney in the instant case was appointed an ALJ for the Department before the administrative hearing. Citing IND.CODE § 4–21.5–3–10 and the Code of Judicial Conduct, U.S. Outdoor argues that both INDOT's attorney and the ALJ should have been disqualified to avoid the appearance of impropriety "and/or a reasonable suspicion that the fact finding process was not impartial." [19] The State observes that U.S. Outdoor does not cite "a single case in support of its proposition that an ALJ is automatically disqualified when the prosecutor in the administrative case is designated to later take office as an ALJ."

IND.CODE § 4–21.5–3–10 reads in relevant part that "[a]ny individual serving or designated to serve alone or with others as an administrative law judge is subject to disqualification for ... (3) any cause for which a judge of a court may be disqualified." Ind. Judicial Conduct Application C(2) provides that a continuing part-time judge "shall not practice law in the court on which the judge serves ... and shall not act as a lawyer in a proceeding in which the judge has served or in any other proceeding relating thereto." Ind. Judicial Conduct Application D(2) mandates these same restrictions for periodic part-time judges.

U.S. Outdoor fails to direct us to any cogent authority to support its assertion that the trial court and the INDOT Commissioner's "refusal to consider evidence concerning

a violation of [its] due process rights constitutes an abuse of discretion and a violation of [IND.CODE § 4–21.5–5–12, allowing 'a court to receive evidence of grounds for disqualification "of those taking the agency action" for judicial review]." In fact, the trial court's findings and conclusions clearly indicate that it did consider U.S. Outdoor's due process concerns regarding the ALJ; an adverse ruling on this issue cannot be equated with a "refusal to consider evidence."

U.S. Outdoor's reliance on *City of Mishawaka v. Stewart*, 261 Ind. 670, 310 N.E.2d 65 (1974) is misplaced, in that the city attorney who presented the case against the petitioner also served as a voting member of the Board of Public Works and Safety that decided the disciplinary issue at bar. In the instant case, there is no evidence that INDOT's attorney had assumed either the office or the duties of an ALJ at the time of the hearing. We agree with the State that under U.S. Outdoor's argument, "the appointment of the prosecutor as an ALJ would immediately terminate and compromise the result of every case he was prosecuting, because every ALJ would become his 'colleague' and would be automatically disqualified for bias." Consequently, we refuse to adopt this impractical and unjust interpretation of Ind. Judicial Conduct Applications C(2) and D(2) and IND. CODE § 4–21.5–3–10.

### IV. Deprivation of U.S. Outdoor's Right to Free Speech and Equal Protection

■ U.S. Outdoor claims that the Billboard Act, specifically IND.CODE § 8–23–20–25, "impermissibly distinguishes between signs based upon their content" and should therefore "be struck down as violative of the free speech and equal protection clauses of the U.S. and Indiana Constitutions." [20] IND.CODE § 8–23–20–25(c) reads as follows:

---

**19.** U.S. Outdoor's footnoted allegation that the ALJ was biased in favor of the INDOT attorney, as demonstrated by his willingness "to enter findings of fact based solely upon the inadmissible hearsay submitted by his colleague," is both unprofessional and unwarranted. IND.CODE § 4–21.5–3–26 expressly provides that an ALJ may admit hearsay evidence, and there is no indication whatsoever that the ALJ admitted the contested evidence because of any bias in favor of INDOT's attorney.

**20.** U.S. Outdoor specifically cites to U.S. CONST. art. I, § 11, which does not exist. It also cites to U.S. CONST amend. XIV ("nor shall any State deprive any person of life, liberty, or property, without due process of law") and IND. CONST. art. I, §§ 9 ("[n]o law shall be passed ... restricting

(c) A permit is not required to erect, operate, use, or maintain the following signs:

(1) Directional or official signs and notices.

(2) Signs advertising the sale or lease of the property on which the sign is located.

(3) Signs that primarily indicate:

(A) the name of the business, activity, or profession conducted;

(B) the types of goods produced or sold; or

(C) the services rendered;

on the property on which the sign is located.

The Bodkin and Shelby signs do not fit within this classification, and U.S. Outdoor challenges the State's regulation of commercial speech as governmental overreaching and impermissibly content-based.

■■■■ Every statute appears before this Court "clothed with the presumption of constitutionality until clearly overcome by a contrary showing." *State Bd. of Tax Com'rs v. Town of St. John,* 702 N.E.2d 1034, 1037 (Ind.1998). The burden of proof is borne by the party challenging the constitutionality of the statute, and all doubts are resolved against that party. *Id.* Commercial speech is protected from unwarranted governmental regulation by the First Amendment, as applied to the States through the Fourteenth Amendment. *Wallace v. Brown County Area Plan Com'n,* 689 N.E.2d 491, 493 (Ind. Ct.App.1998). Commercial speech is afforded a lesser protection by the Constitution than other constitutionally guaranteed expressions. *Id.* "The protection available for a particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Id.* The U.S. Supreme Court has enunciated a four-part test for determining the validity of governmental restriction of commercial speech:

(1) The First Amendment protects commercial speech only if that speech concerns

lawful activity and is not misleading. A restriction on otherwise protected commercial speech is valid only if it (2) seeks to implement a substantial government interest, (3) directly advances that interest, and (4) reaches no further than necessary to accomplish the given objective.

*Metromedia,* 453 U.S. at 507, 101 S.Ct. at 2892, 69 L.Ed.2d at 815, citing *Central Hudson Gas & Electric Corp. v. Public Service Com'n,* 447 U.S. 557, 563–566, 100 S.Ct. 2343 at 2350–2351, 65 L.Ed.2d 341 at 349–351 (1980).

U.S. Outdoor correctly observes that the speech it promotes on the Shelby and Bodkin signs is neither unlawful nor misleading. Our analysis must then focus on the remaining three prongs of the test. U.S. Outdoor argues that the State cannot lawfully distinguish between on-site commercial signs and other types of signs on rural interstate highways in furthering its substantial interest in promoting traffic safety and highway esthetics; however, the U.S. Supreme Court has reached the opposite conclusion on this question:

In the first place, whether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics. This is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising. Second, the city may believe that offsite advertising, with its periodically changing content, presents a more acute problem than does onsite advertising[.] Third, San Diego has obviously chosen to value one kind of commercial speech—onsite advertising—more than another kind of commercial speech—offsite advertising. The ordinance reflects a decision by the city that the former interest, but not the latter, is stronger than the city's interests in traffic safety and esthetics. The city has decided that in a limited instance—onsite commercial advertising—its interests should yield. We do not reject that judgment. As we see it, the city could reasonably conclude that a

the right to speak, write, or print, freely, on any subject whatever") and 23 ("The General Assembly shall not grant to any citizen, or class of

citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens.").

commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere[.] It does not follow from the fact that the city has concluded that some commercial interests outweigh its municipal interests in this context that it must give similar weight to all other commercial advertising. Thus, offsite commercial billboards may be prohibited while onsite commercial billboards are permitted.... In light of the above analysis, we cannot conclude that the city has drawn an ordinance broader than is necessary to meet its interests, or that it fails directly to advance substantial government interests. In sum, insofar as it regulates commercial speech the San Diego ordinance meets the constitutional requirements of *Central Hudson....*

*Metromedia,* 453 U.S. 490 at 511–512, 101 S.Ct. at 2894–2895, 69 L.Ed.2d at 817–818.

We may apply this same reasoning, albeit on a statewide level, to Indiana law in the instant case. The Billboard Act does not draw distinctions among commercial signs based on their *content,* but only on their *location,* which is constitutionally permissible. Whether the Billboard Act unconstitutionally restricts noncommercial speech is a question we need not address for the simple reason that the exclusive regulatory focus of 23 U.S.C. § 131, IND.CODE § 8–23–20, and IND. ADMIN. CODE 105 is outdoor *advertising* signs.[21] Because U.S. Outdoor cannot show that the Billboard Act fails to meet the *Central Hudson* test for governmental restriction of commercial speech, we need not address its constitutional arguments further.

## V. Unconstitutional Taking Without Just Compensation

■ As the State correctly observes, the question of taking and compensation is not properly before this Court because the signs have not yet been removed. IND.CODE § 8–23–20–10 reads in relevant part, "The department may acquire and shall pay just compensation for the removal of signs that do not conform to this chapter. A removal by the department or sign owner under this chapter constitutes a taking, and the owner shall be compensated under [IND.CODE § 32–11–1]." IND.CODE § 8–23–20–11 provides that

> Compensation under section 10 of this chapter shall be paid to a person entitled to compensation upon the presentation to the department of information that the department requires. The claim for compensation must be filed within one hundred eighty (180) days after the removal is completed. The state's share of the compensation shall be paid from funds appropriated under this section.

Finally, IND.CODE § 8–23–20–11 allows for the determination of compensation via a civil court action:

> If a claimant under section 11 of this chapter and the department do not reach agreement on the amount of compensation to be paid within one hundred twenty (120) days after the claim is filed, the claimant may file a civil action to have the compensation determined.... An action under this section shall be filed not later than one (1) year after the filing with the department of a claim for compensation under section 10 of this chapter.

■ U.S. Outdoor cites no authority to support its assertion that the denial of a permit "is effectively an order for the removal of the sign." As noted earlier, U.S. Outdoor sought and received a stay of enforcement of INDOT's order to remove the Bodkin and Shelby signs, rendering its arguments on this issue premature. Also, its reliance on IND.CODE § 8–23–20–16(b) regarding payment of compensation before the removal of a sign is misplaced, in that subsection (b) does not apply to "actions taken by the department under this chapter." IND.CODE § 8–23–20–16(a). Furthermore,

---

**21.** Regardless of the stated purpose of the Billboard Act, it would be difficult for U.S. Outdoor to show that it had standing to argue its unconstitutionality *vis-à-vis* noncommercial signage; both the Bodkin and Shelby signs displayed commercial messages at the time INDOT denied the permit applications.

we agree with the State's argument that U.S. Outdoor's reconstruction of the signs changed their status from legal nonconforming signs to illegal signs; therefore, the State is not required to acquire and pay just compensation for them under IND.CODE § 8–23–20–10. The trial court reached a similar conclusion:

> [U.S. Outdoor's] argument ignores an important fact—the sign did not become illegal merely due to the passage of time or the decision of the ALJ; it became illegal directly as a result of actions voluntarily taken by U.S. Outdoor. U.S. Outdoor chose to substantially [change] its nonconforming signs.... U.S. Outdoor should not be permitted to be compensated for its own failure to comply with federal and state billboard laws.

For similar reasons, we must decline U.S. Outdoor's invitation to analyze INDOT's permit denials under *Stuckman v. Kosciusko County Bd. of Zoning Appeals*, 506 N.E.2d 1079 (Ind.1987) and *Ailes v. Decatur County Area Planning Com'n*, 448 N.E.2d 1057 (Ind. 1983), *cert. denied sub nom. Ripley County Area Plan Com'n v. Rouse*, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984). Both cases stand for the proposition that "[p]rohibition of the continuation of an existing lawful use is unconstitutional as a taking of property without due process of law and as an unreasonable exercise of police power." *Stuckman*, 506 N.E.2d at 1080. If U.S. Outdoor had chosen to follow state and federal regulations and allow the signs to remain "substantially the same" as they were on the date they became nonconforming, the signs would have continued to comply with their "existing lawful use," and INDOT would have been required to issue conditional permits for them under IND. ADMIN. CODE 105, 7–3–7.

### Conclusion

We remand this cause to the department to conduct additional factual findings consistent with the instructions contained in this opinion, with the understanding that the department may then reach a final determination on the matter, subject to U.S. Outdoor's right to petition for judicial review of its decision.

STATON, J., concurs.

RILEY, J., concurs as to issues II, III, IV and V, and dissents as to issue I with separate opinion.

RILEY, Judge, concurring in part and dissenting in part

I respectfully dissent to the remand of this case back to the Indiana Dept. of Transportation "for a hearing to determine the zoning of the properties on which the signs are located."

Reliance on hearsay in support of a finding is not the dispositive issue. The law only precludes reliance *solely* on objected-to hearsay as the entire basis of an administrative decision. Ind.Code 4–21.5–3–26(a).

Our standard in reviewing an administrative agency prohibits us from reweighing evidence and reassessing witness credibility and we must accept the facts as found by the administrative body if they were based upon substantial evidence and did not violate any constitutional, statutory or legal principle. *Phegley v. Indiana Dep't of Highways*, 564 N.E.2d 291 (Ind.Ct.App.1990).

The majority holds that because the ALJ's finding may be supported by hearsay such as affidavits, zoning ordinances and maps that this single finding would change the holding of the administrative decision. I do not believe, as the majority holds, that we are engaging in "semantic sophistry" to affirm the ALJ's decision that U.S. Outdoor's substantial alteration of its billboards destroys their status as non-conforming signs. Because of this status, the signs would not fall under any category that would allow them to obtain permits under Indiana law. I would affirm the trial court's judgment that affirmed INDOT's denial of the permits.

I concur in the majority opinion on Issues II, III, IV, and V.